# EXHIBIT A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

ANTHONY McKERR, HEATHER KOCH, )
JOSEPH FASANO, THOMAS G. FANNING, )
BRANDON KORESS, A. JOHN YAVARI, )
WILLIAM ARMONDA, TODD THIELMANN, )
STEPHEN MELTON, MARK McKENNA, )
WILLIAM MONTGOMERY, RALPH DYNEK, )
SARAH McCARRON, JAMES F. HARKNESS, )   **12CH23185**
MARK ROTHSCHILD, MARK TELANDER, )
STEVEN LOULOUSIS, KEVIN E. DUFFY, )   No.
RORY O'DONNELL, CRAIG S. FELDE, )
BRAD HOFFMAN, MATT McBRIDE, )
SAMUEL M. DADDANO, and MARY McKERR, )

          Plaintiffs, )

                  v. )   **JURY DEMAND**

THE BOARD OF TRADE OF THE CITY OF )
CHICAGO, INC., THE CME GROUP, INC. )
TERRENCE DUFFY, and PHUPINDER GILL, )

          Defendants. )

FILED
CH - 2808
JUN 22 2012
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

## VERIFIED COMPLAINT

Plaintiffs Anthony McKerr, Heather Koch, Joseph Fasano, Thomas G. Fanning,

Brandon Koress, A. John Yavari, William Armonda, Todd Thielmann, Stephen Melton,

Mark McKenna, William Montgomery, Ralph Dynek, Sarah McCarron, James F.

Harkness, Mark Rothschild, Mark Telander, Steven Loulousis, Kevin E. Duffy, Rory

O'Donnell, Craig S. Felde, Brad Hoffman, Matt McBride, Samuel M. Daddano, and

Mary McKerr (collectively "Plaintiffs"), by and through their undersigned attorneys,

respectfully submit their Complaint against the Board of Trade of the City of Chicago,

Inc. ("CBOT"), the CME Group, Inc. ("CME"), Terrence Duffy, and Phupinder Gill

(collectively, "Defendants").

## Nature of the Action

1.    Plaintiffs have been forced to bring this lawsuit against Defendants for injunctive and other relief in order to obtain redress and protect their jobs and livelihoods and those of the CBOT's members, who are shareholders of the CBOT and CME and trade agricultural futures and derivative contracts on the open outcry floor exchanges of the CBOT – known as the "pits".

2.    Historically and to date, one of the main functions of the open outcry system in the "pits" – and those who trade on the CBOT and the CME floor – is to determine final settlement prices at the end of the trading day based upon supply and demand of competitive orders placed by traders, brokers and customer end users either verbally or in writing during a designated closing range time period.

3.    Defendants have violated their fiduciary and contractual duties to Plaintiffs by taking actions they knew and know will almost completely eliminate the demand for the open outcry system, thereby eliminating the vast majority their businesses, jobs and livelihoods (and those of their staff), and reducing the value of their Class B shares in the CBOT.

4.    Specifically, the CME has announced in May, 2012, that the CME and CBOT intend to implement a change to its procedures for determining settlement prices whereby all final price settlements are to be determined by using an algorithm based on a mixture of floor and Globex (electronic trading) information, instead of based on floor-based trading activity for CBOT Agricultural Futures. This will cause – and as this complaint was filed, has already caused - a rapid, dramatic decrease in trades being sent to the Plaintiffs in the "pits," with the result that they, and the overwhelming majority of

other floor traders, will lose business almost immediately and will have to close their operations forever. As a result of this change, hundreds of jobs supported by these traders, including their clerks, runners, information technology and other support staff will – and are being - eliminated.

5. Defendants' decision to make this change is in violation of their fiduciary obligations to Plaintiffs as Class B shareholders of the CBOT and shareholders of the CME by failing to take steps to maintain and support the open outcry system as required under the respective certificates of incorporation of the CBOT and CME.

6. Accordingly, in this action Plaintiffs seek (1) an injunction (a) requiring the CME and CBOT to suspend all revisions to settlement procedures that would require settlement prices to be determined by blending pit closing volume with electronic volume electronically, and (b) enjoining them from altering the CBOT procedures or rules in any manner that would change the way in which settlement is conducted and which would diminish or eliminate open outcry trading in the pits, or that otherwise cause substantial harm to Plaintiffs' ability to continue to do business and trade on the open outcry system; and (2) final judgment awarding them damages and other relief as the Court may deem appropriate.

## The Parties, Jurisdiction and Venue

7. Plaintiffs are professional traders ("Traders") or brokers ("Brokers") who trade and/or fill orders in the Agricultural futures pits on the CBOT, and have done so for years, or own businesses that employ other traders in the pits along with numerous staff such as clerks, runners, information technology professionals and others. The Traders' livelihood and primary employment is derived from trading derivatives in the CBOT's

3

open outcry market, usually on the close of the market so that the determination of the "settlement" price is critical to Plaintiffs' business. All of the Plaintiffs are either shareholders of the CME and Class B shareholders in CBOT, or have leased the interests of Class B shareholders of the CBOT and, therefore, stand in the Class B shareholders' shoes.

8.    Dendant, the CME, is a Delaware corporation that owns and operates a number of large derivatives exchanges, including futures contracts for live cattle, feeder cattle and lean hog (the "Livestock futures"), located in downtown Chicago, Illinois. The CME conducts an extensive amount of business in Cook County, Illinois.

9.    Defendant, the CBOT, is a Delaware corporation and subsidiary of the CME, that owns and operates a number of large derivatives exchanges, including futures contracts for corn, soybeans, soybean oil, soybean meal, oats, wheat and rough rice(the "Agricultural futures"), located in downtown Chicago, Illinois. The CBOT conducts an extensive amount of business in Cook County, Illinois.

10.    The Chicago Board of Trade was founded in 1848 and is one of the world's busiest commodities exchange. It was founded by a group of merchants, seeking to bring order to the Midwest's chaotic grain market, where prices were driven by season as opposed to supply and demand. Out of this foundation grew the concept of a forwards contract or futures contract, which enabled merchants to purchase at set prices for delivery and allow farmers to protect their crops from volatile price swings by hedging through commitment to future delivery at set prices. The CBOT has grown from its first membership of 25 directors to in excess of 3600 members. It was founded as an agricultural exchange and the first non-grain futures contract was not traded until 1968.

4

11. The CBOT provided for competitive bidding and selling of futures contracts by open competition within its membership. Through its membership, the foundation cornerstone has become "My word is my bond". The pricing of futures contracts had over the decades been one of an open competition into the new millennium by its community of trader and broker members. Buying and selling was not only transparent but completed by a verbal acknowledgment which could be quickly recorded and resolved in the event of a dispute between its members. The CBOT facilitated commerce while bringing some order to food pricing in the future.

12. As CBOT transformed itself from a not-for – profit concern to one of for profit, it respected and acknowledged its history of those that built the CBOTC into one of the world's busiest commodities exchanges. As such the CBOT made a covenant with its membership for a commitment to maintain open outcry markets. Its amended and restated certificate of incorporation recognized the integrity of its traders and brokers by this commitment to a system that had worked for businessmen, end users and farmers alike.

13. Defendant Terrence Duffy ("Duffy") is, on information and belief, an Illinois resident and Executive Chairman and President of the CME.

14. Defendant Phupinder Gill ("Gill") is, on information and belief, an Illinois resident and Chief Executive Officer of the CME.

15. The majority of the actions giving rise to this complaint occurred in Cook County, Illinois.

16. In order for a person to trade on the CBOT floor in the open outcry pits, he or she must become a member of the CBOT.

17.     Plaintiffs trade and or fill orders, and have traded and or filled orders for years, in the Agricultural futures pits on the CBOT or own businesses that employ other Traders or Brokers in the pits along with numerous staff such as clerks, runners, information technology professionals and others. The Traders' and Brokers' livelihood and primary employment is derived from trading and filling orders for derivatives in the CBOT's open outcry market.

18.     Both the Agricultural futures of the CBOT and the Livestock futures of the CME are and have historically been traded in similar manner, both in an open outcry system and, only within approximately the past 6 years, side by side, both through open outcry and electronically.

19.     In the open outcry market system, traders compete for buy/sell orders from brokers whose customers have the orders executed in the pits as well other Trader's own market orders by competitive bidding and offering at prevailing prices. Thereby, final settlement prices are derived through transferring information about the orders and arriving at final settlement prices through direct communications with each other – including orally and through hand signals – during a designated closing range time period.

20.     The open outcry system for both the CBOT and the CME have historically determined all settlement prices at the end of the trading day. One of the system's chief benefits is that it can handle large volumes of orders and distribute them in an effective manner. In addition, floor traders provide benefits as counter-parties, adding additional liquidity to the trading contracts, allowing the price to be discovered and the risk shifted by genuine supply and demand.

21.     The open outcry system is fast-paced and becoming a successful Trader or Broker requires years of experience. Because of the specialized nature of the system, the Traders' and Brokers' skills are not easily transferrable to other positions.

22.     In contrast to the open outcry system, an electronic system places buy and sell orders and sets settlement prices electronically, away from the pits, reducing and eliminating the need for floor traders and their staffs.

23.     In addition, because an electronic system calculates settlement prices immediately without reference to the activity on the floor, "flash crashes" and other issues can occur under that system, which can have a detrimental effect on the overall economy.

24.     High frequency traders exist exclusively in the electronic arena. These traders create artificial volume and push markets to cause radical swings for small profits, the effect of which is to impair liquidity and eliminate true price discovery based upon supply and demand as in the open outcry system.

25.     If a blended settlement is adopted to now include electronically traded prices during the closing range, based upon volume weighted average prices, high frequency traders will control unfettered by supply and demand the settlement price.

26.     The proposed new rule of a blended settlement based upon volume weighted average price ("VWAP"), blending the electronic trading with open outcry trading during the close to determine settlement will cause market participants to leave the market and in essence place settlement into the hands of high frequency traders to the detriment of the open outcry system, and therefore the CBOT membership.

27.     Current open outcry customer orders are entered on a time of entry basis, and these orders are filled on a first in first out basis with the broker during the closing range, thereby bringing a substantial certainty to their execution.

28.     By contrast electronic orders are not filled on a first in first out basis. The order fills are determined on a split first in first out/pro-rata algorithm basis, thereby allowing large volume and high frequency traders to assume a greater market share on a less competitive basis.

29.     The higher volume electronic participants pay reduced commissions and receive assurances of greater market order share which can therefore substantially bypass smaller orders in a fractional second, although the smaller order may have been in place all day.

30.     The effect of the proposed blended settlement rule will make current open outcry market participants of no import and deter further participation in that arena.

31.     The CBOT and the CME have historically operated on an open outcry system.

32.     Effective on or about May 29, 2007, the CBOT's parent, CBOT Holdings, Inc., merged into the CME, then known as Chicago Mercantile Exchange Holdings, Inc., and the CBOT became a subsidiary of the CME.

33.     In order to induce CBOT members to retain their memberships at the time of the merger, both the CBOT and the CME represented to the CBOT members, including Plaintiffs, that the CBOT and the CME were committed to maintain open outcry markets. Prior to, and at the time of the merger, the CBOT and the CME represented to the CBOT members that the CME and the CBOT were committed to

8

maintaining the CBOT open outcry markets operating as of April 22, 2005 and would take no action that adversely affected the commitment to maintain the open outcry market unless such change was approved by the CBOT Board of Directors.

34. Under the Amended and Restated Certificate of Incorporation of the CBOT (the "CBOT Certificate"), a copy of which is attached here to as Exhibit A and incorporated herein; which was issued prior to the effective date of the merger between the CBOT and the CME, the CBOT expressly committed to maintain open outcry markets. Article IV, Section D(2)(b) of the CBOT Certificate expressly provides:

> "(b) **In addition to any approval of the Board of Directors** of the Corporation required by this Certificate of Incorporation, the Bylaws or applicable law, the affirmative vote of the holders of a majority of the votes cast, except in the case of paragraph (4) below, by the holders of Series B-1 Memberships and Series B-2 Memberships, voting together as a class based on their respective voting rights at any annual or special meeting of the Corporation, **shall be required to adopt any amendment to this Certificate of Incorporation or the Bylaws or the Rules that,** in the sole and absolute determination of the Board of Directors of the Corporation, **adversely affects:**

\*\*\*

> (4) **the commitment to maintain open outcry markets set forth in Section E of Article IV of this Certificate of Incorporation, which must be approved by a majority of the voting power of the outstanding Series B-1 Membership and Series B-2 Memberships, voting together as a class....**"(Emphasis added). (The certificate of Incorporation is attached hereto as Exhibit A)

The new rule announced by the CME to effectuate a blended settlement procedure for the CBOT Agricultural Futures markets has never been submitted to, much less approved by a majority of the voting power of the outstanding Series B-1 Membership and Series B-2 Memberships, voting together as a class.

35. In addition, in Article IV, Section E of the CBOT Certificate, the CBOT agreed to a commitment to maintain the open outcry markets:

"E. *Commitment to Maintain Open Outcry Markets.* Subject to the terms and conditions of this Section E of Article IV, **the Corporation shall maintain open outcry markets operating as of April 22, 2005 (the "Effective Date") and provide financial support to each such market for technology, marketing and research,** which the Board of Directors of the Corporation determines, in its sole and absolute discretion, is (including, for calculation purposes, volume from Exchange-For-Physicals transactions in such open outcry market).

***

Notwithstanding the foregoing or any other provisions of this Certificate of Incorporation, the Board of Directors of the Corporation may discontinue any open outcry market at such time and in such manner as it may determine if: (1) the Board of Directors determines, in its sole and absolute discretion, that a market is no longer "liquid" or (2) the holders of a majority of the voting power of the then outstanding Series B-1 Memberships and Series B-2 Memberships, voting together as a single class based upon their respective voting rights, approve the discontinuance of such open outcry market." (Emphasis added).

36.     Plaintiffs relied upon the CBOT Certificate and the representations of the CBOT and the CME of their commitment to maintain the open outcry markets in retaining Plaintiff's Class B shares and in continuing the business of the CBOT.

37.     The CME and its subsidiaries, including the CBOT, are one of Illinois' largest employers and corporate taxpayers.

38.     After the Illinois state legislature (the "Legislature") enacted a corporate income tax increase in 2011, the CME threatened to leave the state, taking the CBOT with it – and causing a loss of thousands of Illinois jobs and corporate income – unless it was provided relief from the increase. The CME informed Illinois Legislature that a tax break would prevent a significant loss of jobs in the state.

39.     Late in 2011, the Legislature responded to CME's threats, and passed a bill that was signed into law by Governor Quinn on December 16, 2011, providing the

10

CME with a significant tax break. Immediately afterwards, the CME announced that it would remain in Illinois.

40.    A significant amount of the jobs and income that the CME represented to the Illinois Legislature that would remain in Illinois if the CME was given a significant tax break arise from the activities of individual traders and trading businesses whose income is earned through the open outcry activity in the pits.

41.    At the same time that the CME was seeking its tax break based upon representations that jobs and income of the CME and its subsidiaries, including the CBOT, would remain in Illinois, the CME was intending to eliminate many of the jobs and income from the open outcry activity of the pits. On or about December 12, 2011, the CME announced in a Special Executive Report ) ("Report") that on or around March 2012, it would revise the rule for determining settlement prices to require that settlement prices for Livestock futures at the CME and Agricultural futures contracts at the CBOT, including Corn, Soybeans, Soybean Oil, Soybean Meal, Oats, Wheat, Rough Rice, Live Cattle, Feeder Cattle, and Lean Hogs, would be determined through an algorithm that incorporates both floor-based activity and electronic trading activity, as opposed to being determined in the pits via the open outcry system. A true and correct copy of the Special Executive Report is attached hereto as Exhibit B.

42.    The decision to base settlement by blending the volume of trades during the close between open outcry and electronic trading, or the VWAP procedure will effectively close the open outcry markets – which will rapidly become illiquid – and will result in overwhelming losses of jobs and income to Plaintiffs. Also as a result, the value of the Class B shares of the CBOT will rapidly lose value.

43.     Historically when such changes have been made in other futures contracts markets, in excess of 90% of all trading volume has moved to the electronic system, creating job loss and weakening liquidity in these contracts.

44.     An electronically weighted volume settlement procedure has been in effect for the Wheat pit since 2009. Prior to a weighted volume settlement rule the Wheat pit contained in excess of 200 brokers and traders all CBOT members, including a number of Plaintiffs, in addition to the hundreds of employees of these members. As a result of the adoption of the electronically weighted volume settlement procedure for the Wheat pit, the open outcry market for the Wheat pit almost immediately ceased to exist. As of 2012, there are less than 10 members participating in the open outcry market in the Wheat pit.

45.     As a result of electronically weighted settlement, Wheat prices have experienced more volatile closing ranges than it previously had.

46.     The Oats Pit at the CBOT implemented VWAP for its settlement in December 2011. To date in 2012, the open outcry volume is down 94%.

47.     Plaintiff Joe Fasano, has been a Class B shareholder of the CBOT for 15 years, a shareholder of the CME, and a broker in the Corn pit at the CBOT. Fasono's open outcry orders alone represent 5% of the total volume traded world wide daily in the Corn pit. Fasono's closing range orders represent 95% of his business. Fasono's customers have communicated to him that they will no longer participate in the open outcry arena after the implementation of the proposed blended settlement rule. Fasono will therefore have his entire brokerage business destroyed. Fasano also traded in the Wheat pit prior to the adoption of the electronically volume weighted settlement rule for the Wheat pit. After adoption of that settlement procedure Fasano was unable to earn a

living trading in the open outcry market, and Fasano was forced to cease all business in the Wheat pit.

48.    Plaintiff Tony McKerr is a Class B shareholder of the CBOT, a shareholder of the CME and currently trades daily in the Corn pit at the CBOT. McKerr has made his livelihood trading in the open outcry arena at the CBOT for the past 28 years. Approximately eighty percent of McKerr's income is derived from trading the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, McKerr will lose the vast majority his livelihood and therefore his business as a trader will be ended.

49.    Plaintiff Heather Koch is and has been a Class B shareholder of the CBOT for 15 years. Koch trades daily in the Soybean, Soybean Oil and Soybean Meal pits Koch is a member of a proprietary trading firm. A large percentage of Koch's income for her firm is derived from trading the closing range with settlement determined by open outcry orders and from trading with Brokers or Traders who are in the pits daily. If the new settlement rule is adopted, Koch will lose the vast majority her livelihood and therefore her business as a trader will be ended.

50.    Plaintiff Mary McKerr is a Class B shareholder of the CBOT, a shareholder of the CME and currently trades daily in the Corn pit at the CBOT. McKerr has made her livelihood trading in the open outcry arena at the CBOT for the past 29 years. Approximately eighty percent of McKerr's income is derived from trading the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, McKerr will lose the vast majority her livelihood and therefore her business as a trader will be ended.

51.     Plaintiff Bard Hoffman currently trades in the Soyben pit of the CBOT and has traded at the CBOT for approximately 20 years. A large percentage of Hoffman's income is derived from trading the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, Hoffman will lose the vast majority his livelihood and therefore his business as a trader will be ended.

52.     Plaintiff Ralph Dynek trades in the Corn pit of the CBOT and has traded at the CBOT for approximately 20 years. A large percentage of Dynek's income is derived from trading the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, Dynek will lose the vast majority his livelihood and therefore his business as a trader will be ended.

53.     Plaintiff Craig S. Felde has been a broker in the Corn pit of the CBOT for approximately 20 years. A large percentage of Felde's income is derived from filling orders in the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, Felde will lose the vast majority his livelihood and therefore his business as a broker will be ended.

54.     Plaintiff Rory O'Donnell has traded in the Corn pit of the CBOT for approximately 6 years. A large percentage of O'Donnell's income is derived from trading the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, O'Donnell will lose the vast majority his livelihood and therefore his business as a trader will be ended.

55.     Plaintiff Kevin Duffy is a Class B shareholder of the CBOT and currently acts as a broker daily in the Corn pit at the CBOT. Duffy has made his livelihood filling orders in the open outcry arena at the CBOT for the past 23 years. A large percentage of

14

Duffy's income is derived from filling orders in the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, Duffy will lose the vast majority his livelihood and therefore his business as a broker will be ended.

56.     Plaintiff Steven Loulousis is a Class B shareholder of the CBOT and currently trades daily in the Corn pit at the CBOT. Loulousis has made his livelihood trading in the open outcry arena at the CBOT for years.   A large percentage of his income is derived from trading the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, Loulousis will lose the vast majority his livelihood and therefore his business as a trader will be ended.

57.     Plaintiff Mark Telander is a Class B shareholder of the CBOT and currently trades daily in the Corn pit at the CBOT. Loulousis has made his livelihood trading in the open outcry arena at the CBOT for the past 4 years.   A large percentage of his income is derived from trading the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, Telander will lose the vast majority his livelihood and therefore his business as a trader will be ended.

58.     Plaintiff Mark Rothschild is a Class B shareholder of the CBOT and currently trades daily in the Corn pit at the CBOT. Rothschild has made his livelihood trading in the open outcry arena at the CBOT for the past 14 years.   A large percentage of his income is derived from trading the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, Rothschild will lose the vast majority his livelihood and therefore his business as a trader will be ended.

59.     Plaintiff James F. Harkness is a Class B shareholder of the CBOT and currently trades daily in the Corn pit at the CBOT. Harkness has made his livelihood

trading in the open outcry arena at the CBOT for the past 10 years. A large percentage of his income is derived from trading the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, Harkness will lose the vast majority his livelihood and therefore his business as a trader will be ended.

60. Plaintiff Thomas Fanning is a Class B shareholder of the CBOT, a shareholder of the CME and currently trades daily in the Corn pit at the CBOT. Fanning has made his livelihood trading in the open outcry arena at the CBOT for the past 14 years. A large percentage of his income is derived from trading the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, Fanning will lose the vast majority his livelihood and therefore his business as a trader will be ended.

61. Plaintiff Sarah McCarron has traded in the Corn pit of the CBOT for approximately 6 years. A large percentage of McCarron's income is derived from trading the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, MCarron will lose the vast majority her livelihood and therefore her business as a trader will be ended.

62. Plaintiff A John Yavari owns 50% of Century Group Trading, which clears certain CBOT's members trades at the CBOT. If the new settlement rule is adopted, Yavari's income will be greatly affected by the loss of Traders in the Agricultural Futures pits and his clearing business will be substantially impaired.

63. Plaintiff Mark McKenna is a Class B shareholder of the CBOT and currently trades daily in the Corn pit at the CBOT. McKenna has made his livelihood trading in the open outcry arena at the CBOT for the past 19 years. A large percentage

of his income is derived from trading the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, McKenna will lose the vast majority his livelihood and therefore his business as a trader will be ended.

64. Plaintiff Todd Theilman is a Class B shareholder of the CBOT and currently acts as a broker daily in the Corn, Wheat, and Soybean pits at the CBOT. Thielman has made his livelihood filling orders in the open outcry arena at the CBOT for years. A large percentage of his income is derived from filling orders in the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, Thielman will lose the vast majority his livelihood and therefore his business as a broker will be ended.

65. Plaintiff William Montgomery has traded in the Corn pit of the CBOT for approximately 6 years. A large percentage of Montgomery's income is derived from trading the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, Montgomery will lose the vast majority his livelihood and therefore his business as a trader will be ended.

66. Plaintiff Stephen Melton has traded in the Corn pit and at the CBOT for approximately one year. A large percentage of Melton's income is derived from trading the closing range with settlement determined by open outcry orders. If the new settlement rule is adopted, Melton will lose the vast majority his livelihood and therefore his business as a trader will be ended.

67. Plaintiff William Armonda has traded in the Corn pit and at the CBOT for approximately 24 years. A large percentage of Armando's income is derived from trading the closing range with settlement determined by open outcry orders. If the new

17

settlement rule is adopted, Armando will lose the vast majority his livelihood and therefore his business as a trader will be ended.

68.     Plaintiff Samual Daddano has traded in the Corn pit and at the CBOT for approximately 16 years. A large percentage of Daddano's income is derived from trading the closing range with settlement determined by open outcry orders.  If the new settlement rule is adopted, Daddano will lose the vast majority his livelihood and therefore his business as a trader will be ended.

69.     Plaintiff Matt McBride is a Class B shareholder of the CBOT and currently trades daily in the Corn pit at the CBOT.  McBride has made his livelihood trading in the open outcry arena at the CBOT for approximately 12 years.   A large percentage of his income is derived from trading the closing range with settlement determined by open outcry orders.  If the new settlement rule is adopted, McBride will lose the vast majority his livelihood and therefore his business as a trader will be ended.

70.     Plaintiff Brandon Koress is a Class B shareholder of the CBOT and currently trades daily in the Corn pit at the CBOT.  Koress has made his livelihood trading in the open outcry arena at the CBOT for approximately 20 years.   A large percentage of his income is derived from trading the closing range with settlement determined by open outcry orders.  If the new settlement rule is adopted, Koress will lose the vast majority his livelihood and therefore his business as a trader will be ended.

71.     All Plaintiffs as CBOT members or lessees will be out of business, if the new settlement rule is adopted, whether as an order filler, market maker member of a proprietary trading firm, or member of a clearing firm.

72.     Plaintiffs and numerous others have objected to the rule change for these reasons. See Exhibit C attached hereto.

73.     Defendants did not consult with the Plaintiffs or, upon information and belief any other Class B open outcry traders or their clients prior to issuing the Special Executive Report designed to change the settlement rule.

74.     Defendants were aware of the potential adverse effects that making a change to the settlement rule would have upon the Plaintiffs and other traders in the open outcry markets.

75.     Both the Class B Members of the CBOT and the Class B Members of the CME, who traded in the open outcry pits and their customers, objected to the proposed change in settlement procedures set forth in the Special Executive Report.

76.     The CBOT Directors Committee of the CME rejected the proposal for a blended settlement procedure set forth in the Special Executive Report, finding that "the proposed change in settlement procedures would materially impair the business of the [CBOT] or materially impair the business opportunities of the Class B memberships", such as those of Plaintiffs. See Exhibit D attached hereto.

77.     The Rule Change Committee of the CME also rejected the proposed change in settlement procedures recognizing that such change would materially impair Membership interests of Class B members of the CBOT, who traded Agriculture futures in the open outcry pits and Class B members of the CME, who traded Livestock futures in the open outcry pits.

78.     Due to the objections of the Class B Members of the CME and their customers that the proposed change would materially impair Class B shares and

adversely affect the open outcry markets, in or about March 2012, the CME notified the Class B Members of the CME that the CME would not be implementing the proposed change in settlement procedures for Livestock futures contracts. Despite the fact that the same adverse effects would be suffered by the Class B Members of the CBOT and their customers, the CME refused to stop implementation of the proposed change for the CBOT Agricultural futures contracts. On March 5, 2012, the CME issued a second Special Executive Report, stating:

"Given consideration of significant market feedback following the release of S-6048, the dialogue with the CFTC and the need for adequate market place notification regarding the operational details of any prospective changes to the settlement methodologies, no changes to settlement procedures will be implemented in March or April.

Beginning in June 2012, the CBOT agricultural futures will transition to a blended settlement methodology using volume-weighted prices from both Floor-based activity and Globex-based activity. Further information on the specific methodology to be employed and the specific implementation dates will be communicated via Special Executive Report when final details are available.

Additionally, decisions regarding settlement procedures in CME Livestock futures contracts have yet to be finalized pending on going dialogue with the CFTC. Further information will be communicated with respect to CME Livestock futures when it become available."

See Exhibit E attached hereto.

79. Pursuant to the Seventh Amended and Restated Bylaws of the CME, the CBOT Directors Committee and the Rule Change Committee of the CME expired on May 23, 2012.

80. On May 24, 2012, because they could not obtain the approval of a majority of the CBOT Board, purportedly pursuant to Rule 230(j) of the CME Rules, Defendants Duffy as the Executive Chairman and President of the CME, and Phupidner,

20

as Chief Executive Officer of the CME, announced that the CME intended to adopt the new, proposed settlement methodology for Agricultural futures contracts for the CBOT. See Exhibit D attached hereto. No similar proposed change has been adopted for the Livestock futures market of the CME itself. On May 25, 2012, the CME issued a Special Executive Report entitled "New Settlement Methodology for CBOT Agricultural futures Effective June 25, 2012." A true and correct copy of the May 25, 2012 Special Executive Report is attached hereto and made a part hereof as Exhibit F.

81. The methodology for determining closing settlement price for the CBOT is determined by Rule 813 of the CBOT Rulebook, which provides in relevant part:

> "Daily settlement prices shall be determined each business day for each product pursuant to one or more of the procedures set forth below. The settlement price shall be a price consistent with the minimum tick increment for the product; if the calculated settlement price is not a standard tick increment, the calculated settlement price will be rounded either to the nearest tick or to the tick closer to the previous day's settlement price. The procedure used to determine the settlement price of a product will depend on the product group, level of activity and liquidity during the defined closing time period, and the trading venue(s) used to derive the settlement. To the extend that any members participate in the creation of settlement prices, they agree to assign and transfer to the Exchange any and all right, title and interest in and to the settlement prices, including, but not limited to, all copy right in the settlement prices.

> 1. Midpoint of the Closing Range: In products that use this procedure, the first trade and all subsequent trades, higher bids and lower offers that are quoted during the established closing time period will be included in the closing range. The midpoint of the high and low quotes in the closing range will be the settlement price. If no trade occurs during the defined closing period, the last quote of the day (trade, higher bid, lower offer) will be the settlement price. In the event there are no valid quotes during the day, the settlement price will be the prior day's settlement price."

Closing settlement prices for products in the Agricultural Futures pits have always been determined based upon the "Midpoint of the Closing Range." Eliminating the ability to close settlement prices based upon the "Midpoint of the Closing Range" and requiring all

products to close upon a volume-weighted average price constitutes an amendment to the Rules. This amendment to the Rules adversely affects the commitment to maintain open outcry markets, as has been previously determined by the CBOT Directors Committee of the CME, and has never been approved by a "majority of the voting power of the outstanding Series B-1 Membership and Series B-2 Memberships, voting together as a class...."

82.     In addition, the CBOT defines "Rules" as:

"The Certificate of Incorporation, By-Laws, rules, interpretations, orders, resolutions, advisories, notices, manuals and similar directives of the Exchange, and all amendments thereto."

Thus, the May 25, 2102 Special Executive Report constitutes a "Rule." Under Article IV, Section D(2)(b) of the CBOT Certificate, this new Rule must be approved by a "majority of the voting power of the outstanding Series B-1 Membership and Series B-2 Memberships, voting together as a class..." since the CBOT Directors Committee of the CME has already determined that it adversely affects the commitment to maintain open outcry markets and materially impairs the business opportunities of the Class B memberships, such as those of Plaintiffs."

83.     The CME itself has acknowledged that the proposed change in settlement methodology is not necessary to prevent market manipulation or market disruption, stating that:

• "Contracts Not Readily Subject to Manipulation: **CME Group employs a variety of settlement methodologies across its product portfolio and has not observed that the execution venue from which the settlement price is derived impacts whether a contract is readily susceptible to manipulation. In CBOT agricultural futures, the current methodology of settling the designated lead month contract based upon the prices and volume of outright transactions and of settling the remaining contract months based upon the prices and**

volume of relevant spread transactions, or bid/offer data where transactions have not occurred, has proven to yield reliable settlement prices, whether the methodology is based on activity in the electronic venue or activity in the open outcry venue. The changes to the settlement methodology for CBOT agricultural futures will incorporate activity from both venues into the settlement price calculations for each of the futures contracts, thereby increasing the number and volume of transactions, as well as the number of participants, informing the settlement price determination.

• Prevention of Market Disruption: The Global Command Center, the CME Group Settlement team and the Market Regulation Department each have the capacity to identify abnormal price movements during the settlement period and to take remedial actions as appropriate relative to their respective functions. **CBOT has settled certain agricultural futures contracts based on open outcry activity and others based on electronic activity, and in either case the methodology has not impeded the Exchange's ability to effectively monitor trading and mitigate the potential for market disruptions.** Incorporating activity from both venues into the settlement price determination will not diminish the Exchange's ability in this regard." (Emphasis added).

See Exhibit D attached hereto.

84. The proposed change in the settlement methodology for Agricultural futures contracts of the CBOT breaches the commitment to maintain open outcry markets of the CBOT and will effectively discontinue such markets for each and all of the following reasons:

85. .... In violation of Articles IV, Section D(2)(b) of the CBOT Certificate, the proposed change in the settlement methodology for Agricultural futures contracts of the CBOT has never been submitted to, or approved by the Board of Directors of the CBOT. In violation of Articles IV, Section E of the CBOT Certificate, the Board of Directors of the CBOT never determined that the open outcry markets were no longer "liquid". In fact the proposed change will likely result in such markets becoming illiquid and obsolete. Finally, in violation of Articles IV, Section E of the CBOT Certificate, the

23

proposed change in the settlement methodology for Agricultural futures contracts to be submitted to and approved by the Class B Membership of the CBOT.

86.     Defendants' decision was made in disregard to the commitment to maintain an open outcry market to make the change to an electronic system failed to account for the substantial countervailing interests and reasons for sustaining the open outcry system.

87.     Defendants are aware that the decision to move to an electronic settlement system will sound the death knell for the vast majority of trading in the pits and will result in overwhelming losses of jobs and income to the Plaintiffs as well as to other pit traders and businesses on the CBOT – a circumstance that the CME claimed it sought to avoid by seeking a reduction in its tax burden from the Illinois legislature.

## COUNT I
## INJUNCTIVE RELIEF

1-87.   Plaintiffs repeat and reallege herein the allegations contained in Paragraphs 1 through 87 as if fully restated herein.

88.     By and through the CBOT Certificate, Defendants entered into an agreement with Class B shareholders of the CBOT.

89.     The CBOT Certificate provide the Plaintiffs certain rights, protections and interests, including the commitment to maintain open outcry markets, and further provides that any amendment to any rule which adversely affects the open outcry markets must be approved by both the Board of Directors of the CBOT and "**a majority of the voting power of the outstanding Series B-1 Membership and Series B-2 Memberships, voting together as a class....**" The new rule announced by the CME to

24

effectuate a blended settlement procedure for the CBOT Agricultural Futures markets has never been submitted to, much less approved by a majority of the voting power of the outstanding Series B-1 Membership and Series B-2 Memberships, voting together as a class. In addition, the Certificate provides that the open outcry markets cannot be discontinued unless the CBOT Board of Directors determines that the open outcry markets are no longer liquid or a majority of Class B shareholders votes in favor of a change, neither of which has occurred.

90.    If Defendants implement and do not reverse the changes in settlement procedures from a floor based settlement to a blended weighted volume with electronic pricing, there is a significant and real likelihood that the open outcry system will become obsolete.

91.    Unless the CBOT, by and through its Board of Directors, officers and agents, takes action to comply with their respective fiduciary duties to protect Plaintiffs' interests and investment in the company and with its contractual obligations to maintain and support the open outcry market, Plaintiffs will be seriously and irreparably harmed. They will face the loss of their and their employees' livelihoods and their businesses, and also suffer significant losses as a result of plummeting values in their investments in their Class B shares.

92.    There is no adequate remedy at law for the Plaintiffs' losses, especially for the loss of their livelihoods, businesses and jobs for their own employees and staff, many of whom have no other transferable skills or training in other fields.

WHEREFORE, Plaintiffs request the following relief:

(1)    A temporary, preliminary and permanent order:

A. requiring Defendants to maintain the status quo by suspending all rules and procedures requiring settlement prices to be determined by blending open outcry prices with electronic prices based upon volume; and

B. enjoining Defendants from altering the CBOT procedures or rules in any manner that would change the way in which settlement is conducted, diminish or eliminate open out cry trading in the pits, or that otherwise would cause substantial harm to Plaintiffs' ability to continue to do business and trade on the open outcry system.

(2) For such other and further relief as the Court deems just and appropriate.

## COUNT II
## BREACH OF CONTRACT

1-92. Plaintiffs repeat and reallege herein the allegations contained in Paragraphs 1 through 92 as if fully restated herein.

93. By and through the CBOT Certificate, Defendants entered into an agreement with its Class B shareholders and those holding the interests of Class B shareholders.

94. Plaintiffs have performed all obligations required of them pursuant to the CBOT Certificate.

95. The CBOT has breached its obligations under the CBOT Certificate by adopting a rule which adversely affects the open outcry market without submitting such new rule to, much less obtaining approval by both the Board of Directors of the CBOT and "a majority of the voting power of the outstanding Series B-1 Membership and Series B-2 Memberships, voting together as a class...."

26

96. In addition because the new rule announced by the CME to effectuate a blended settlement procedure for the CBOT Agricultural Futures markets will effectively eliminate the open outcry markets, the CBOT breached the certificate because the CBOT Board of Directors never determined that the open outcry markets were no longer liquid nor did a majority of Class B shareholders votes in favor of a change.

97. Plaintiffs have suffered damages as a result of Defendants' breaches.

WHEREFORE, Plaintiffs request the following relief:

A. Damages in excess of $50,000 an amount to be proven at trial; and

B. For such other and further relief as the Court deems just and appropriate.

## COUNT III
## BREACH OF FIDUCIARY DUTY

1-97. Plaintiffs repeat and reallege herein the allegations contained in Paragraphs 1 through 97 as if fully restated herein.

98. Defendants owe fiduciary duties to the CBOT's shareholders like Plaintiffs, including the duties of care and loyalty.

99. Defendants breached their fiduciary duties to Plaintiffs by unilaterally determining to change the CBOT procedures for reaching settlement prices to a blended settlement methodology for Agricultural Futures contracts of the CBOT without approval **"by a majority of the voting power of the outstanding Series B-1 Membership and Series B-2 Memberships, voting together as a class."**

100. Defendants breached their fiduciary duties by implementing a system that adversely affects and harms Plaintiffs' interests as Class B shareholders and that violates

the CBOT's obligations to maintain and sustain the open outcry markets. Defendants breached their fiduciary duties to Plaintiffs by unilaterally determining to change the CBOT procedures for reaching settlement prices to an electronic platform, without any determination by the CBOT Board of Directors much less a finding by the CBOT Board of Directors that the open outcry markets are no longer liquid, and without approval from a majority of the Series B-1 and Series B-2 members. Defendants breached their fiduciary duties by implementing a system that adversely affects and harms Plaintiffs' interests in Series B-1 membership and violated their fiduciary duty to maintain and sustain the open outcry markets.

101.    Defendants' conduct in conjunction with the decision to change the settlement system also violated their duty of loyalty and good faith to Plaintiffs. Defendants knew at the time that they determined to make the change that the increase in electronic trading volume that result would inure to the benefit of high frequency electronic traders, and to the detriment of the traders in the "pits." Thus, they failed to act in Plaintiffs' best interests. In addition, Defendants discriminated against Series B-1 members of the CBOT by adopting the change for the Agricultural Futures pit but refusing to adopt the change for the Livestock Futures pit of the CME. Thus, Plaintiffs are likely to succeed on the merits of their claims against Defendants.

102.    Plaintiffs have suffered damages as a result of Defendants' breaches of their fiduciary duties.

WHEREFORE, Plaintiffs request the following relief:

A.    Damages in excess of $50,000 an amount to be proven at trial; and

B.    For such other and further relief as the Court deems just and appropriate.

28

SCHOENBERG, FINKEL, NEWMAN & ROSENBERG, LLC

By: _George E. Sang_

One of Plaintiffs' Attorneys

George E. Sang
Richard Goldwasser
William R. Klein
Schoenberg, Finkel, Newman & Rosenberg, LLC
222 S. Riverside Plaza, Suite 2100
Chicago, IL 60606
312/648-2300
Firm I.D. 43280

29

## VERIFICATION

Under penalties of perjury as provided pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned hereby certifies that I am one of the Plaintiffs in the above-captioned matter, that the matters set forth in the foregoing Verified Complaint are true and correct, except as to matters alleged to be on information and belief, which the undersigned certifies as aforesaid that he verily believes the same to be true.

SUBSCRIBED and SWORN to before me this 21ˢᵗ day of June, 2012.

_____
Notary Public

OFFICIAL SEAL
GEORGE E SANG
Notary Public - State of Illinois
My Commission Expires Apr 6, 2016

## VERIFICATION

Under penalties of perjury as provided pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned hereby certifies that I am one of the Plaintiffs in the above-captioned matter, that the matters set forth in the foregoing Verified Complaint are true and correct, except as to matters alleged to be on information and belief, which the undersigned certifies as aforesaid that she verily believes the same to be true.

SUBSCRIBED and SWORN to before
me this ___ day of June, 2012.

_____
Notary Public

OFFICIAL SEAL
GEORGE E SANG
Notary Public - State of Illinois
My Commission Expires Apr 8, 2016

## SUPREME COURT RULE 222 AFFIDAVIT

The undersigned, being sworn on oath, deposes and states that the total damages

sought in this matter exceed $50,000.

SUBSCRIBED and SWORN to before me
on this 21st day of June, 2012.

_____
Notary Public

OFFICIAL SEAL
GEORGE E SANG
Notary Public - State of Illinois
My Commission Expires Apr 8, 2016

# A

## AMENDED AND RESTATED
## CERTIFICATE OF INCORPORATION
## OF
## BOARD OF TRADE OF THE
## CITY OF CHICAGO, INC.
### (ORIGINALLY INCORPORATED IN THE STATE OF DELAWARE UNDER THE NAME DELAWARE CBOT, INC. ON MAY 12, 2000)

### ARTICLE I

### NAME

The name of the corporation is Board of Trade of the City of Chicago, Inc. (hereinafter referred to as the "Corporation").

### ARTICLE II

### REGISTERED AGENT

The address of the registered office of the Corporation in the State of Delaware is 160 Greentree Drive, Suite 101, in the City of Dover, County of Kent, Delaware 19904. The name of the registered agent of the Corporation at such address is National Registered Agents, Inc.

### ARTICLE III

### CORPORATE PURPOSES

The nature of the business or purposes to be conducted or promoted by the Corporation are to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law (as amended from time to time, the "DGCL").

### ARTICLE IV

### MEMBERSHIP

A. *General.*

The Corporation shall have no authority to issue capital stock. The terms and conditions of membership in the Corporation shall be as provided in or pursuant to this Certificate of Incorporation, the Bylaws of the Corporation (the "Bylaws") and the Rules and Regulations of the Corporation as in effect from time to time (the "Rules").

B. *Classes and Series of Membership.*

Membership in the Corporation shall be divided into classes and series as set forth in this Article IV.

1. *Class A Membership.*

There shall be one Class A Membership in the Corporation (the "Class A Membership" and the holder thereof, the "Class A Member"), which Class A Membership shall be held by CME Group Inc., a Delaware corporation ("CME Group"). It shall be a term and condition of such Class A Membership that such membership may not be transferred to or held by any person or entity other than CME Group unless authorized by an amendment to this Section B(1) of Article IV. Except to the extent (if any) expressly provided herein or required by law, the Class A Member shall have the right to vote on any matter to be voted on by the members of the Corporation other than on those matters expressly reserved to the vote of the holders of Series B-1 Memberships and Series B-2 Memberships (each as defined in Section B(2) of this Article IV) and shall have the exclusive right to receive any dividend or other distribution (including upon liquidation, dissolution, winding-up or otherwise) to be declared, paid or distributed by the Corporation, and no other member of or class or series of membership in the Corporation shall be entitled to vote on any matter except as set forth in Section D(2) or Section E of this Article IV or Article IX of this Certificate of Incorporation, or to receive any such dividend or other distribution.

## 2. Class B Membership.

(a) Class B Memberships in the Corporation (each a "Class B Membership" and the holder thereof, a "Class B Member") shall represent the right to trade on and otherwise utilize the facilities of the Corporation in accordance with and to the extent permitted by this Certificate of Incorporation, the Bylaws and, to the extent not inconsistent with this Certificate of Incorporation, the Bylaws or the Rules. There shall be authorized three thousand six hundred eighty-one (3,681) Class B Memberships, which shall be divided into five (5) series ("Series") as follows:

1,402 Series B-1 Memberships (each, a "Series B-1 Membership" and the holder thereof, a "Series B-1 Member");

867 Series B-2 Memberships (each, a "Series B-2 Membership" and the holder thereof, a "Series B-2 Member");

128 Series B-3 Memberships (each, a "Series B-3 Membership" and the holder thereof, a "Series B-3 Member");

641 Series B-4 Memberships (each, a "Series B-4 Membership" and the holder thereof, a "Series B-4 Member"); and

643 Series B-5 Memberships (each, a "Series B-5 Membership" and the holder thereof, a "Series B-5 Member");

(b) Notwithstanding Section B(2)(a) of this Article IV, the Corporation may issue additional authorized but unissued Series B-2 Memberships only in connection with the conversion of Series B-3 Memberships into Series B-2 Memberships pursuant to Section D(3) of this Article IV and no person may become or qualify as a Series B-2 Member at any time by acquiring a theretofore authorized but unissued Series B-2 Membership except as a result of such a conversion.

(c) Class B Memberships shall have no right to receive any dividend or other distribution (including upon liquidation, dissolution, winding-up or otherwise) to be declared, paid or distributed by the Corporation. The respective rights and privileges of each Series of Class B Membership shall be as provided in or pursuant to this Certificate of Incorporation and the Bylaws.

## C. Class B Voting Rights.

Except as otherwise expressly provided in this Certificate of Incorporation, the holders of Class B Memberships shall not be entitled to vote on any matter. On any matter on which the holders of Series B-1 Memberships and Series B-2 Memberships are entitled to vote together as a single class pursuant to this Certificate of Incorporation, each holder of Series B-1 Memberships shall be entitled to one (1) vote per such membership and each holder of Series B-2 Memberships shall be entitled to one-sixth (1/6) of one (1) vote per such membership.

## D. Special Rights of Class B Membership.

The holders of each Series of Class B Membership shall have the trading rights and other rights and privileges, and shall be subject to the restrictions, terms and conditions, set forth below.

### 1. Series Trading Rights.

(a) *Series B-1 Memberships.* Each holder of a Series B-1 Membership who satisfies the qualifications for and requirements of Full Membership in the Corporation as set forth in the Rules shall be entitled to the rights and privileges of, and shall be subject to the restrictions, conditions and limitations on, a Full Member as set forth in this Certificate of Incorporation, the Bylaws and the Rules. Each holder of a Series B-1 Membership shall also be entitled to all trading rights and privileges for all new products first made available after the filing of this Certificate of Incorporation traded on the open outcry exchange system of the Corporation or Chicago Mercantile Exchange Inc. ("CME Exchange") or any electronic trading system maintained by the Corporation or CME Exchange or any of their respective successors or successors-in-interest, and the Board of Directors of the Corporation shall enforce this requirement.

(b) *Series B-2 Memberships.* Each holder of a Series B-2 Membership who satisfies the qualifications for and requirements of Associate Membership in the Corporation as set forth in the Rules shall be entitled to

the rights and privileges of, and shall be subject to the restrictions, conditions and limitations on, an Associate Member as set forth in this Certificate of Incorporation, the Bylaws and the Rules.

(c) *Series B-3 Memberships.*

(1) Each holder of a Series B-3 Membership who satisfies the qualifications for and requirements of being a holder of a one-half Associate Membership as set forth in clause (2) of Rule 296.00 of the Rules shall be entitled to the rights and privileges of, and subject to the restrictions, conditions and limitations on, a holder of a one-half Associate Membership as set forth in this Certificate of Incorporation, the Bylaws and the Rules.

(2) Each holder of a Series B-3 Membership who satisfies the qualifications for and requirements of being a holder of a GIM Membership Interest in the Corporation as set forth in clause (1) of Rule 296.00 of the Rules shall be entitled to the rights and privileges of, and shall be subject to the restrictions, conditions and limitations on, a holder of a GIM Membership Interest as set forth in this Certificate of Incorporation, the Bylaws and the Rules.

(d) *Series B-4 Memberships.* Each holder of a Series B-4 Membership who satisfies the qualifications for and requirements of being a holder of an IDEM Membership Interest in the Corporation as set forth in the Rules shall be entitled to the rights and privileges of, and shall be subject to the restrictions, conditions and limitations on, a holder of an IDEM Membership Interest as set forth in this Certificate of Incorporation, the Bylaws and the Rules.

(e) *Series B-5 Memberships.* Each holder of a Series B-5 Membership who satisfies the qualifications for and requirements of being a holder of a COM Membership Interest in the Corporation as set forth in the Rules shall be entitled to the rights and privileges of, and shall be subject to the restrictions, conditions and limitations on, a holder of a COM Membership Interest as set forth in this Certificate of Incorporation, the Bylaws and the Rules.

(f) In addition to the rights and privileges set forth above, except as otherwise provided in the Certificate of Incorporation, the Bylaws or the Rules, each holder of a Class B Membership of any Series shall be entitled to all trading rights and privileges with respect to those products that such holder is entitled to trade on the open outcry exchange system of the Corporation or any electronic trading system maintained by the Corporation or any of its successors or successors-in-interest.

2. *Series B-1 Membership and B-2 Membership Voting Rights; Certain Covenants.*

(a) In addition to any approval of the Board of Directors of the Corporation required by this Certificate of Incorporation, the Bylaws or applicable law, the affirmative vote of the holders of a majority of the votes cast by the holders of Series B-1 Memberships and Series B-2 Memberships, voting together as a class based on their respective voting rights at any annual or special meeting of the Corporation, shall be required to adopt (subject to the immediately following sentence) any amendment of, or any modification or repeal of any provisions contained in, Section B(2), Section C, Section D, Section E or Section F of Article IV or the second sentence of Article IX of this Certificate of Incorporation or, during the Transition Period (as defined in the bylaws of CME Group) Article VI. Notwithstanding the foregoing, the holders of Series B-1 Memberships and Series B-2 Memberships shall not be entitled to a vote on any merger, consolidation or reorganization of the Corporation that results, by operation of law or otherwise, in an amendment, modification or repeal of this Certificate of Incorporation so long as the rights and privileges of the holders of Series B-1 Memberships and Series B-2 Memberships set forth in Section B(2), Section C, Section D, Section E and Section F of Article IV and the second sentence of Article IX and, during the Transition Period, Article VI of this Certificate of Incorporation are preserved in the Certificate of Incorporation or other governing document of the surviving corporation of such transaction.

(b) In addition to any approval of the Board of Directors of the Corporation required by this Certificate of Incorporation, the Bylaws or applicable law, the affirmative vote of a majority of the votes cast, except in the case of paragraph (4) below, by the holders of Series B-1 Memberships and Series B-2 Memberships, voting together as a class based on their respective voting rights at any annual or special meeting of the Corporation, shall be required to adopt any amendment to this Certificate of Incorporation or the Bylaws or the Rules that, in the sole and absolute determination of the Board of Directors of the Corporation, adversely affects:

(1) the allocation of products that a holder of a specific Series of Class B Membership is permitted to trade on the exchange facilities of the Corporation (including both the open outcry trading system and the electronic trading system),

(2) the requirement that, except as provided in that certain Agreement, dated August 7, 2001, between the Corporation and the Chicago Board Options Exchange (the "CBOE"), as modified by that certain Letter Agreement, dated October 7, 2004, between the Corporation, CBOT Holdings, Inc. and the CBOE, in each case, as may be amended from time to time in accordance with their respective terms, holders of Class B Memberships who meet the applicable membership and eligibility requirements will be charged transaction fees for trades of the Corporation's products for their accounts that are lower than the transaction fees charged to any participant who is not a holder of Class B Membership for the same products, whether trading utilizing the open outcry trading system or the electronic trading system,

(3) the membership qualifications or eligibility requirements for holding any Series of Class B Membership or exercising any of the membership rights and privileges associated with such Series,

(4) the commitment to maintain open outcry markets set forth in Section E of Article IV of this Certificate of Incorporation, which must be approved by a majority of the voting power of the outstanding Series B-1 Memberships and Series B-2 Memberships, voting together as a class, or

(5) the ability of a Class B Member to engage in dual-trading, unless such amendment to the Bylaws or Rules is required, in the opinion of counsel, by applicable law or governmental rule or regulation.

For purposes of Section D(2)(b)(1) of Article IV, the allocation of products that the holders of any Series of Class B Membership are permitted to trade on the exchange facilities of the Corporation shall be deemed to be adversely affected only if a product is eliminated from the allocation of products the holders of a particular Series of Class B Memberships are permitted to trade.

(c) Following the date of filing of this Certificate of Incorporation, and unless otherwise agreed to by the Series B-1 Members and the Series B-2 Members voting together as a single class in accordance with Section C of this Article IV, the Corporation shall use commercially reasonable efforts to preserve the Exercise Right for the benefit of the Series B-1 Members and their delegates, including (i) defending any actions, suits or proceedings brought to challenge all or any portion of the Exercise Right and, in the event of an adverse ruling or determination, pursuing reasonable grounds for appeal, (ii) taking reasonable steps, including instituting actions, suits and proceedings and pursuing reasonable grounds for appeal, to secure for the Series B-1 Members and their delegates that have exercised the Exercise Right the right to receive any dividends or other distributions to be made by the CBOE to its members and (iii) complying with the Corporation's obligations under agreements with the CBOE regarding the Exercise Right, including making available to the CBOE the information specified in any such agreements or any surveillance plans with the CBOE; provided that the Corporation shall not be required in connection with its obligations under the foregoing clauses (i) and (ii) of this Section D(2)(c) of this Article IV of this Certificate of Incorporation to contribute to any settlement or satisfy the obligation of any third party.

(d) On any matter on which holders of Series B-1 Memberships and Series B-2 Memberships are entitled to vote pursuant to paragraphs (a) and (b) of this Section D(2) of Article IV, such holders of Series B-1 Memberships and Series B-2 Memberships shall be the only members of the Corporation entitled to vote thereon. Holders of Series B-1 Memberships and Series B-2 Memberships shall have no other voting rights except as expressly set forth herein and shall not have the right to take action by written consent in lieu of a meeting and shall have no right to initiate any proposal, at or for any meeting of members. One-third of the total voting power of the Series B-1 Memberships and Series B-2 Memberships present in person or by proxy shall constitute a quorum at any meeting to take action on the matters as to which such holders are entitled to vote pursuant to paragraphs (a) and (b) of Section D(2) of this Article IV. Series B-3 Memberships, Series B-4 Memberships and Series B-5 Memberships shall have no right to vote on any matters or to initiate any proposals at or for any meeting of members. For purposes of any vote of the holders of Series B-1 Memberships and Series B-2 Memberships permitted by this Certificate of Incorporation, the Board of Directors of the Corporation shall be entitled to fix a record date, and only holders of record as of such record date shall be entitled to vote on the matter to be voted on.

(e) During the period ending at the annual meeting of shareholders of CME Group to be held in 2012, the Corporation will provide the CBOT Directors (as defined in the bylaws of CME Group) with advance notice (a "Rule Change Notice") of any proposed change to the Rules (a "Proposed Rule Change"). If a majority of the CBOT Directors provide written notice to the Corporation (an "Initial Rejection Notice") within five (5) business days after delivery of the Rule Change Notice (the "Initial Rejection Notice Period") that they have determined in their sole discretion that any such Proposed Rule Change will materially impair the business of the Corporation or materially impair the business opportunities of the holders of the Class B Memberships, such Proposed Rule Change will be submitted to a committee of the Board of Directors of the Corporation (the "Rule Change Committee") comprised of three CBOT Directors designated by the Vice Chairman of the Corporation and two CME Directors designated by the Chairman of the Corporation for approval. Approval shall require the affirmative vote of a majority of the full Rule Change Committee. The Corporation shall not effect any Proposed Rule Change unless and until either (a) the Initial Rejection Notice Period terminates without the CBOT Directors providing an Initial Rejection Notice with respect to such Proposed Rule Change or (b) the Rule Change Committee approves such Proposed Rule Change.

3. *Conversion Rights of Series B-3 Memberships.*

(a) *Conversion.* Subject to, and upon compliance with, the provisions of this Section D(3) of Article IV, any two (2) Series B-3 Memberships shall be convertible at the option of the holder into one (1) Series B-2 Membership.

(b) *Mechanics of Conversion.* A holder of Series B-3 Memberships may exercise the conversion right specified in Section D(3)(a) of Article IV by delivering to the Corporation or any transfer agent of the Corporation written notice stating that the holder elects to convert such memberships, accompanied by the certificates or other instruments, if any, representing the memberships to be converted. Conversion shall be deemed to have been effected on the date when delivery of such written notice, accompanied by such certificate or other instrument, if any, is made, and such date is referred to herein as the Conversion Date.

As promptly as practicable after the Conversion Date, the Corporation may issue and deliver to or upon the written order of such holder a certificate or other instrument, if any, representing the number of Series B-2 Memberships to which such holder is entitled as a result of the exercise of such conversion right. The person in whose name the certificates or other instruments representing Series B-2 Memberships are to be issued shall be deemed to have become the holder of record of such Series B-2 Memberships on the applicable Conversion Date.

(c) *Memberships Reserved for Issuance.* The Corporation shall take all actions necessary to reserve and make available at all times for issuance upon the conversion of Series B-3 Memberships, such number of Series B-2 Memberships as are issuable upon the conversion of all outstanding Series B-3 Memberships.

E. *Commitment to Maintain Open Outcry Markets.* Subject to the terms and conditions of this Section E of Article IV, the Corporation shall maintain open outcry markets operating as of April 22, 2005 (the "Effective Date") and provide financial support to each such market for technology, marketing and research, which the Board of Directors of the Corporation determines, in its sole and absolute discretion, is reasonably necessary to maintain each such open outcry market.

Notwithstanding the foregoing or any other provision of this Certificate of Incorporation, the Board of Directors of the Corporation may discontinue any open outcry market at such time and in such manner as it may determine if (1) the Board of Directors determines, in its sole and absolute discretion, that a market is no longer "liquid" or (2) the holders of a majority of the voting power of the then outstanding Series B-1 Memberships and Series B-2 Memberships, voting together as a single class based on their respective voting rights, approve the discontinuance of such open outcry market.

For purposes of the foregoing, an open outcry market will be deemed "liquid" for so long as it meets either of the following tests, in each case as measured on a quarterly basis:

(a) if a comparable exchange-traded product exists, the open outcry market has maintained at least 30 percent (30%) of the average daily volume of such comparable product (including for calculation purposes, volume from Exchange-For-Physicals transactions in such open outcry market); or

(b) if no comparable exchange-traded product exists, the open outcry market has maintained at least 40 percent (40%) of the average quarterly volume in that market as maintained by the Corporation in 2001

(including, for calculation purposes, volume from Exchange-For-Physicals transactions in such open outcry market).

The commitment to maintain open outcry markets set forth in this Section E of Article IV will not apply to markets introduced after the Effective Date.

F. *Exercise Rights*. Subject to the terms and conditions of this Section F of Article IV of this Certificate of Incorporation:

1. Each holder of record on the official books and records of the Corporation as of May 29, 2007 of (I) a Series B-1 Membership in respect of which an Exercise Right Privilege (as defined in Rule 210(b) of the Rules) is issuable but has not been issued or (II) both (a) one or more Exercise Right Privileges and (b) a Series B-1 Membership shall have the right, exercisable during the forty five (45) day period (the "Offer Period") immediately following the effective time of the merger of CBOT Holdings, Inc. ("CBOT Holdings") with and into Chicago Mercantile Exchange Holdings Inc. ("CME Holdings") pursuant to the terms of that certain Agreement and Plan of Merger, dated as of October 17, 2006, as amended, among the Corporation, CBOT Holdings and CME Holdings, to sell any such Exercise Right Privilege to the Corporation for an amount equal to $250,000 in cash (a "Purchase Offer"). In order to exercise the Purchase Offer, such holder must deliver to the Corporation prior to the expiration of the Offer Period (i) the Exercise Right Privilege and (ii) a duly executed assignment agreement in the form attached to this Certificate of Incorporation as Annex A (the "Assignment Agreement"). The Corporation shall make payment as provided in this Section F.1 to a holder who makes the required delivery of the Exercise Right Privilege and Assignment Agreement within thirty (30) days after the expiration of the Offer Period.

2. In the event of a Final Resolution (as defined below) pursuant to which the Class Members (as defined below) receive a recovery of cash, marketable securities or other property or rights with respect to each Exercise Right Privilege held by a Class Member and/or retain or are declared to have property or rights with respect to each Exercise Right Privilege held by a Class Member (collectively, a "Per ERP Recovery") with an aggregate Fair Market Value (as defined below) less than $250,000, the Corporation shall pay to each such Class Member with respect to each such Exercise Right Privilege held by such Class Member an amount equal to the difference between $250,000 and the Fair Market Value of the Per ERP Recovery so received or retained, as applicable, by such Class Member with respect to such Exercise Right Privilege held by such Class Member (a "Balance Payment"). In order for a Class Member to receive a Balance Payment with respect to an Exercise Right Privilege, such Class Member must provide evidence reasonably satisfactory to the Corporation that such Class Member received the Per ERP Recovery pursuant to the Final Resolution with respect to such Exercise Right Privilege. The Corporation shall make payment to such holder prior to the later of (i) thirty (30) days after delivery of the sufficient evidence contemplated by the immediately preceding sentence or (ii) thirty (30) days after the date the Fair Market Value of the Per ERP Recovery is determined in accordance with the terms of Section 5(e) of this Section F of Article IV of this Certificate of Incorporation.

3. In the event of the entry of a Zero Judgment (as defined below), the Corporation will pay to each Non-Recovery Class Member (as defined below) $250,000 for each Exercise Right Privilege held by such Non-Recovery Class Member. The Corporation shall make payment to a Non-Recovery Class Member within thirty (30) days after the date the such person's status as a Non-Recovery Class Member is determined in accordance with the terms of Section 5(g) of this Section F of Article IV of this Certificate of Incorporation.

4. Notwithstanding anything to the contrary contained in this Section F of this Article IV of this Certificate of Incorporation, in no event shall the Corporation be required to pay in excess of $250,000 in respect of any single Exercise Right Privilege.

5. For purposes of this Section F of Article IV of this Certificate of Incorporation, the term:

   (a) "*CBOE Litigation*" means that litigation captioned *CBOT Holdings, Inc., et al. v. Chicago Board Options Exchange, Inc., et al.*, Civil Action No. 2369-VCN (Del. Ch. Ct.);

   (b) "*Class Member*" means (i) if a class is certified by the Court in the CBOE Litigation, any member of such class or (ii) if a class is not certified by the Court in the CBOE Litigation, any person or entity who satisfies the definition of a member of the class as set forth in the Complaint, so long as the Exercise Right Privileges purchased by the Corporation pursuant to this Section may be used by a member of the class to participate in a Final Resolution (*provided, however*, that in no event shall CBOE or any direct or indirect transferee of an Exercise Right Privilege from CBOE be considered a "Class Member" for purposes of this Section F of this Article IV of this Certificate of Incorporation);

(c) *"Court"* means the Delaware Chancery Court presiding over the CBOE Litigation;

(d) *"Complaint"* means the complaint on file with the Court setting forth the claims in the CBOE Litigation as of the time of the Final Resolution;

(e) *"Date of Determination"* means the date of the Final Resolution giving rise to the need to determine Fair Market Value;

(f) *"Fair Market Value"* means, with respect to the components of any Per ERP Recovery, the sum of (1) the amount of cash received plus (2) the value of any marketable securities received, which shall be deemed to have a per security value equal to the average of the closing prices of such marketable security for the ten trading days ending on the day immediately preceding the Date of Determination on the principal national securities exchange or inter- dealer quotation system on which such marketable securities are listed or admitted to trading plus (3) the value of any other property or rights received or retained, the value of such property or right being determined on the basis of an arm's length transaction between a willing buyer and a willing seller based on then prevailing market conditions and taking into account all circumstances determined to be relevant to the establishment of such price at such time but disregarding any liquidity, minority, transferability or other discounts by an independent investment banking firm with a national reputation that is recognized to have expertise in valuations of such other property or rights selected by the CBOT Directors (or, if no CBOT Directors exist at such time, their successors) and approved by the full Board of Directors of the Corporation;

(g) *"Final Resolution"* means a final, non-appealable resolution of all claims of the Class Members set forth in the Complaint that is binding on all Class Members, which may include, without limitation (i) a judgment of the Court resolving the CBOE Litigation, (ii) a settlement resolving the CBOE Litigation confirmed by an order of the Court and (iii) if the CBOE Litigation is dismissed other than on its merits, a decision or order of, or settlement with, a governmental authority or third party arbitrator with respect to all claims of the Class Members set forth in the Complaint; *provided, however*, in the case of clauses (i) and (ii) that such settlement, decision or order does not prevent the Exercise Right Privileges purchased by the Corporation pursuant to this Section F of this Article IV of this Certificate of Incorporation from being used by a member of the class to participate in a Final Resolution;

(h) *"Non-Recovery Class Member"* means any person who provides evidence reasonably satisfactory to the Corporation that such person meets the requirements of a Class Member; and

(i) *"Zero Judgment"* means a Final Resolution pursuant to which the Class Members do not receive or retain, as applicable, any Per ERP Recovery.

6. The Board of Directors of the Corporation shall be authorized to adopt, change or waive any Rule as it deems necessary or advisable to enable the Corporation to acquire or dispose of Exercise Right Privileges in order to satisfy its obligations under this Section F of this Article IV of this Certificate of Incorporation and to realize the value of the Exercise Right Privileges acquired pursuant to paragraph 1 of this Section F of this Article IV of this Certificate of Incorporation. The provisions of Section D(2)(e) of this Article IV of this Certificate of Incorporation shall not apply to any adoption, change or waiver of a Rule pursuant to this paragraph 6 of this Section F of this Article IV of this Certificate of Incorporation; *provided*, that nothing in this paragraph 6 of this Section F of this Article IV of this Certificate of Incorporation shall be interpreted to permit the Corporation to impose fees, costs or expenses on Class B Members in order to acquire the Exercise Right Privileges.

## ARTICLE V

## MANAGEMENT OF AFFAIRS

The following provisions are inserted for the management of the business and the conduct of the affairs of the Corporation, and for further definition, limitation and regulation of the powers of the Corporation and of its directors and members:

A. In accordance with Sections 141(a) and 141(j) of the DGCL, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors of the Corporation. In addition to the powers and authority expressly conferred upon them by statute or by this Certificate of Incorporation or the Bylaws, the directors are hereby empowered to exercise all powers and do all acts and

things as may be exercised or done by the Corporation, subject, nevertheless, to the provisions of the DGCL, this Certificate of Incorporation and any Bylaws adopted by the Class A Member; provided, however, that no Bylaws hereafter adopted by a member of the Corporation shall invalidate any prior act of the directors which would have been valid if such Bylaws had not been adopted.

B. A special meeting of members shall be called by the Chairman of the Board or the Board of Directors of the Corporation upon receipt by the Chairman of the Board or the Secretary of the Corporation of a written demand of a majority of the directors then holding office.

C. Any action required or permitted to be taken by the members of the Corporation must be effected at a duly called annual or special meeting of members of the Corporation and may not be effected by any consent in writing by such members, provided that the Class A Member shall have the right to effect by consent in writing any action which would require the approval of the Class A Member at a duly called annual or special meeting of the members of the Corporation.

## ARTICLE VI
## BOARD OF DIRECTORS

The number of directors of the Corporation shall be as from time to time fixed by, or in the manner provided in, the Bylaws. Election of directors need not be by written ballot unless the Bylaws so provide. The Board of Directors of the Corporation shall at all times be comprised of the same directors as those of CME Group.

## ARTICLE VII
## AMENDMENT OF BYLAWS

The Board of Directors of the Corporation is expressly empowered to adopt, amend or repeal the Bylaws of the Corporation. The Class A Member shall also have power to adopt, amend or repeal the Bylaws. The only member of the Corporation with any power to adopt, amend or repeal the Bylaws of the Corporation shall be the Class A Member, and no other member of, or class or series of membership in, the Corporation shall have any such power. Except as specifically provided in the Rules, no member of, or class or series of membership in, the Corporation shall have any power to adopt, amend or repeal the Rules.

## ARTICLE VIII
## LIMITATION OF LIABILITY

A director of the Corporation shall not be personally liable to the Corporation or its members for monetary damages for breach of fiduciary duty as a director, except for liability (A) for any breach of the director's duty of loyalty to the Corporation or its members, (B) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (C) under Section 174 of the DGCL, or (iv) for any transaction from which the director derived an improper personal benefit. If the DGCL is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended.

Any repeal or modification of the foregoing paragraph shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification. For purposes of this Article VIII, the term "director" shall, to the fullest extent permitted by the DGCL, include any person who, pursuant to this Certificate of Incorporation, is authorized to exercise or perform any of the powers or duties otherwise conferred upon a board of directors by the DGCL.

## ARTICLE IX
## AMENDMENT OF CERTIFICATE OF INCORPORATION

The Corporation reserves the right to amend, modify or repeal any provision contained in this Certificate of Incorporation in the manner prescribed by the laws of the State of Delaware, and all rights conferred upon the members of the Corporation are granted subject to this reservation. Any amendment of, or modification or repeal of any provision contained in, Section B(2), Section C, Section D, Section E or Section F of Article IV or this sentence of this Article IX or, during the Transition Period, Article VI of this Certificate of Incorporation (subject to the last

sentence of Section D(2)(a) of Article IV, by merger or otherwise) shall require, first, the approval of the Board of Directors of the Corporation and, second, the approval of a majority of the votes cast by the Series B-1 Members and Series B-2 Members, voting together as a single class in accordance with Section C of Article IV. Except as provided in the immediately preceding sentence, any amendment of, or modification or repeal of any provision contained in, this Certificate of Incorporation shall require, first, the approval of the Board of Directors of the Corporation and, second, the approval of the Class A Member and no other member or series or class of membership shall have the right to vote on any such amendment or repeal.

* * * *

**[Form of Assignment Agreement for the sale of Exercise Right Privilege]**

The undersigned (the *"Selling ERP Holder"*) is the holder of record on the official books and records of the Board of Trade of the City of Chicago (*"CBOT"*) as of May 29, 2007 of (I) a Series B-1 Membership (as defined in the Amended and Restated Certificate of Incorporation of CBOT (the *"Certificate of Incorporation"*)) in respect of which an Exercise Right Privilege (as defined in Rule 210(b) of the Rules and Regulations of CBOT) (referred to hereinafter as an *"ERP"*) is issuable but has not been issued or (II) both (a) an ERP and (b) a Series B-1 Membership and proposes to sell such ERP to CBOT for an amount equal to $250,000 in cash pursuant to Section F of Article IV of the Certificate of Incorporation.

The Selling ERP Holder understands that CBOT only has a commitment to purchase an ERP for which delivery of the ERP together with this Assignment Agreement, duly executed by the Selling ERP Holder, is made to CBOT during the forty-five (45) day period immediately following the effective time of the merger of CBOT Holdings, Inc. (*"CBOT Holdings"*) with and into Chicago Mercantile Exchange Holdings Inc. (*"CME Holdings"*) pursuant to the terms of that certain Agreement and Plan of Merger, dated as of October 17, 2006, as amended, among the CBOT, CBOT Holdings and CME Holdings.

    1. The Selling ERP Holder represents and warrants to CBOT that:

        a. The Selling ERP Holder has valid title to the ERP, free and clear of all security interests, claims, liens, equities or other encumbrances (*"Liens"*), and has the legal right and power, and all authorization and approval required by law or the certificate of incorporation or by-laws (or equivalent organizational documents) of the Selling ERP Holder (if the Selling ERP Holder is not a natural person), to enter into this Assignment Agreement and to sell, transfer and deliver the ERP to be sold by such Selling ERP Holder. When the ERP is delivered to and paid for by CBOT in accordance with the terms of this Assignment Agreement and the Certificate of Incorporation, CBOT will have valid title to the ERP, free and clear of all Liens.

        b. The execution and delivery by the Selling ERP Holder of, and the performance by the Selling ERP Holding of its obligations under, this Assignment Agreement will not contravene any provisions of applicable law, or the certificate of incorporation or by-laws (or equivalent organizational documents) of the Selling ERP Holder (if the Selling ERP Holder is not a natural person), or any agreement or other instrument binding upon the Selling ERP Holder or any judgment, order or decree of any governmental body, agency or court having jurisdiction over the Selling ERP Holder, and no consent, approval, authorization or order of, or qualification with, any governmental body or agency is required for the performance by the Selling ERP Holder of its obligations under this Assignment Agreement.

        c. The Selling ERP Holder did not acquire the ERP in a transfer directly or indirectly from the Chicago Board Options Exchange, Inc.

    2. CBOT shall make payment to the Selling ERP Holder in accordance with Section F of Article IV of the Certificate of Incorporation to the account set forth on the signature page hereto.

    3. This Assignment Agreement shall be governed by the internal laws of the State of Delaware, without regard to conflict of law principles.

In witness whereof, the undersigned has duly executed this Assignment Agreement this      day of     , 2007.

 

                                   _____
                                   Signature of Selling ERP Holder

Selling ERP Holder:

Name:   _____

Address: _____

         _____

Phone:   _____

Selling ERP Holder hereby authorizes CBOT to remit the proceeds from the sale of the ERP to CBOT to the following account:

Bank Name: _____
Bank Address: _____

ABA#: _____
Account#: _____
Account Name: _____

[Signature Page to Assignment Agreement for the Sale of Exercise Right Privilege]

B


## CME Group

Special Executive Report

---

S-6048                                                     December 12, 2011

### Forthcoming Revisions to Settlement Procedures
### for CME and CBOT Agricultural Futures

In the interest of enhancing procedures for the determination of settlement prices in CBOT and CME agricultural futures, CBOT and CME will be making modifications to their respective settlement procedures in the following futures contracts:

CBOT: Corn, Soybeans, Soybean Oil, Soybean Meal, Oats, Wheat and Rough Rice

CME: Live Cattle, Feeder Cattle and Lean Hogs

Presently, settlement procedures in most of these contracts rely on Floor-based activity, while Wheat (first five contract months) and Rough Rice rely exclusively on Globex-based activity. The basic approach of the new methodologies will be to include additional information in the settlement calculation by incorporating both Floor and Globex activity in the determination of settlement prices.

Additional details regarding the specific settlement methodologies and the timelines for rollout in the various products will be communicated early in 2012. It is currently anticipated that the transition to the new settlement procedures will occur during March and April 2012, subject to relevant CFTC regulatory review periods.

Questions may be directed to Julie Holzrichter, Managing Director, Global Operations at 312.930.3208 or Julie.Holzrichter@cmegroup.com or to Dean Payton, Managing Director, Market Regulation at 312.435.3658 or Dean.Payton@cmegroup.com.

For media inquiries concerning this Advisory Notice, please contact CME Group Corporate Communications at 312.930.3434 or news@cmegroup.com.

C

December 28, 2011

As a long standing customer and shareholder of the Chicago Mercantile Exchange, I am writing to voice my complaint about the proposed change in the settlement procedures in live cattle, feeder cattle and hog futures in the spring. I am a floor broker and trader and have a wide range of clients which include commercial hedge accounts, customer business, IB's and hedge funds.

I am also a co owner of Grainery Farms. We use the exchange to hedge over 7,000 acres of farmland in three different states. This represents over 2 million dollars in annual grain sales.

We all believe that the current pit based settlement is a key factor to our business and a change to electronic or hybrid settlement would have a detrimental effect on all of our business.

We believe the price discovery and transparency that is achieved from open outcry is superior to that achieved from electronic settlement procedures.

I feel my own volume combined with the entire customer and filling business I do represents a significant amount of volume. I am requesting that the CME revisit this decision and take these facts into consideration to keep the current pit settlement procedures in place.

Respectfully,

William Rinn III



Jennifer Mayer <jmayer@icarustrading.com>

# Fwd: CME Hybrid Settlement Pricing

1 message

**From the Desk of Heather K <hk@icarustrading.com>**          Thu, Dec 22, 2011 at 10:59 AM
Reply-To: hk@icarustrading.com
To: Jennifer Mayer <jmayer@icarustrading.com>

---------- Forwarded message ----------
From: True, Harry (FLNA) <Harry.True@pepsico.com>
Date: Tue, Dec 20, 2011 at 13:37
Subject: CME Hybrid Settlement Pricing
To: "hk@icarustrading.com" <hk@icarustrading.com>

Dear Sir:

I am writing to advise that we do not support the movement to a determination of settlement prices by any form of "hybrid devices" based on a combination of open outcry and electronic markets. We believe strongly that the closing values and settlement procedures long used by open outcry methodology offers the truest form of market close price discovery.

We certainly acknowledge the value of the electronic platforms in use for extended hour sessions and believe that the methodologies in place since their advent are more than adequate for continuation "as is". We believe that it is important that the impact of people over machines be sustained by the CME institution as a viable "check" as well as "compliment" to the movement towards the electronic era. In many situations, the use of people, during the open outcry sessions, have led to more effective transaction clarity than has been our experience with electronic activities. It is because of this that we strongly favor the continuation of a separate but equal standing between open outcry and electronic closes and market activity.

Harry W. True
Sr. Director
Commodity Operations
Frito-Lay, Inc.





Jennifer Mayer <jmayer@icarustrading.com>

# Fwd: Proposed CBT Soybean Meal and Soybean Oil changes

1 message

**From the Desk of Heather K <hk@icarustrading.com>**            Thu, Dec 22, 2011 at 10:59 AM
Reply-To: hk@icarustrading.com
To: Jennifer Mayer <jmayer@icarustrading.com>


---------- Forwarded message ----------
From: **Mark Wiklund** <mealoil@gmail.com>
Date: Wed, Dec 21, 2011 at 15:59
Subject: Proposed CBT Soybean Meal and Soybean Oil changes
To: hk@icarustrading.com, Chris Conwell <cfconwell@gmail.com>


To whom it may concern at CME:

My name is Mark Wiklund, and my firm Wiklund Trading has been a member firm of CBT since 1983. We primarily trade grain contracts, with most emphasis in Soybean Meal and Soybean Oil trade. This has been our primary focus since 1988. We trade open outcry and electronic, both day and night. We make markets in these commodities every day of the year.

My comment is this, the closing rotation rules and current settlement procedures work great. Do not fix something that has worked so well for so many years.

The closing rotation process in Meal and Oil is the fairest to customers. These markets are relatively thin, and market makers are necessary to take the opposite side of these closing relatively large orders. These customers have very large orders that are best filled by market makers on the floor making two sided markets for size. On the computer these customers are unable to broadcast to the market that they want to buy or sell in size. They want size bids and offers by market makers. This is what happens under the current method because market makers like ourselves realize the broker wants to move size, so our traders on the floor provide two sided size markets.

The second point I would like to make is a natural follow up to my first point. Because these customers want to do size and market makers like ourselves provide size bid/asks to the brokers these customers naturally want the market to settle at the price they bought or sold the most quantity. Not some average of 60 seconds worth of prices.

I hope you will consider my comments. They are made in good faith as a long time market maker in these relatively thin markets. Please feel free to contact me if you have any questions on my comments. Thank you.

Mark

--
*Mark B. Wiklund*
Managing Partner
Wiklund Trading, LLC
Suite 3430
141 W. Jackson Blvd.

Chris Myers
775 Ridge Lake Blvd
Memphis, TN 38120

January 17, 2012

Dear CME GROUP,

As an active customer with a family FARM and family owned GRAIN ELEVATOR, I am writing to voice my strong opposition to the proposed change in the rule regarding settlement procedures in the CME and CBOT agricultural contracts. When electronic trading was introduced, I was excited about the new platform to enhance agricultural markets. The marketplace was led to believe there would be 2 venues that were transparent, equitable and liquid. What you have now is 2 diluted markets that are not held to the same rules. Electronic markets are not on an even playing field and these destructive practices have driven needed participants to use other methods of trading and hedging. The poor decisions being made will affect the marketplace and ultimately the jobs that support the industry.

I appreciate the liquidity and transparency currently used with pit settlements; and feel the use of electronic trade is easily manipulated. By passing this rule, you will give more power to the electronic trade that manipulated and compromised the integrity of the grain and livestock contracts.

Sincerely,

Chris Myers



# TEJAS TRADING CO.

(806) 463-2144 • Fax (806) 463-3113 • 1-800-700-4149 • 3310 I 40 West • Suite 100 • Amarillo, Texas 79102

To Whom It May Concern:

We here at Tejas Trading Co. are concerned about taking pit settlement out of the physical pit and placing it in the hands of computer algorithms. We believe the current system used via open outcry is fair and has worked well for years. After all Open outcry has been around since the CME's inception and we believe it should stay.

Thank You,



## pit settlements
1 message

Jim Yadgir <jyadgir1515@yahoo.com>                              **Wed, Dec 28, 2011 at 8:16 PM**
To: ajyajy1@gmail.com

TO THE CME EXCHANGE GROUP..

I AM CONCERNED ABOUT PIT SETTLEMENTS BEING REMOVED FROM THE PHYSICAL PIT.... AND
BEING PLACED IN THE HANDS OF ALOGORITHMS.

THE PITS HAVE WORKED EFFICENTLY FOR DECADES IN THE THIS MANNER.. OPEN OUTCRY...
I FEEL THIS WOULD GREATLY HURT THE INDUSTRY AND CUSTOMERS AS WELL IF THIS IS
CHANGED.

                    SINCERLY,
                      JAMES YADGIR.
                    GENERAL PARTNER
                    FORECAST VENTURE FUND



(806) 463-2144 • Fax (806) 463-3113 • 1-800-700-4149 • 3310 I-40 West • Suite 100 • Amarillo, Texas 79102

To Whom It May Concern:

We here at Tejas Trading Co. are concerned about taking pit settlement out of the physical pit and placing it in the hands of computer algorithms. We believe the current system used via open outery is fair and has worked well for years. After all Open outery has been around since the CME's inception and we believe it should stay.

Thank You,

To CME Group,

As an active customer of the CME Group, I am writing to voice my strong opposition to the proposed rule change regarding settlement procedures in a variety of CME and CBOT products. The current method of pit and open outcry settlement adequately meets my needs. Furthermore, I appreciate the liquidity and transparency currently offered with pit settlement.

Thank you for your consideration.

WLG Farms

Robbie Russell
BMI Group, LLC
775 Ridge Lake Blvd.
Suite 450
Memphis, TN 38120

January 17, 2012

Dear CME GROUP,

As an active customer, both grain and livestock farmer and grain elevator, I am writing to
voice my strong opposition to the proposed change in the rule regarding settlement
procedures in the CME and CBOT agricultural contracts. When electronic trading was
introduced, I was excited about the new platform to enhance agricultural markets. The
marketplace was led to believe there would be 2 venues that were transparent, equitable
and liquid. What you have now is 2 diluted markets that are not held to the same rules.
Electronic markets are not on an even playing field and these destructive practices have
driven needed participants to use other methods of trading and hedging. The poor
decisions being made will affect the marketplace and ultimately the jobs that support the
industry.
I appreciate the liquidity and transparency currently used with pit settlements; and feel
the use of electronic trade is easily manipulated. By passing this rule, you will give more
power to the electronic trade that manipulated and compromised the integrity of the grain
and livestock contracts.


Sincerely,

Robbie Russell

Jason Caplan
1510 Gordon Terrace
Deerfield, IL 60015
December 22, 2011

Terry Duffy
CME Group
141 W Jackson
Chicago, IL 60604

Dear Mr. Duffy:

As an active member of CME Group for over 7 years, and a shareholder since going public, I'm shocked to learn the blantent disregard for your clients and shareholders concerns regarding market transparency and settlement procedures.

Market transparency has been subjected to constant manipulation since a majority of the trading volume in the Lean Hog Market has migrated to the electronic platform. The size and price of both the bid and sell side are placed there to cause a major market move which fulfills their objective, and then to ultimetly remove their markets causing a drastic move in the reverse direction. No market transparency, just manipulation!!!!!!!!!!!!!!!!!!!

The last remaining true market price that the customers can rely on is pit settlement. It is not affected by algorithms, and flash trades. It is only affected by the true supply and demand of its customers. If you question that statement, research the percent change where the market opens up the following day.

Its time that the CME Group stop woring about lining the pockets of certain board members, and remember that this exchange, and most of their products were invented to protect the CUSTOMER from risks beyond their control and the ability to hedge their livelihood.

Sincerely,

Jason Caplan

December 28, 2011

As a long standing customer and shareholder of the Chicago Mercantile Exchange, I am writing to voice my complaint about the proposed change in the settlement procedures in live cattle, feeder cattle and hog futures in the spring. I am a floor broker and trader and have a wide range of clients which include commercial hedge accounts, customer business, IB's and hedge funds.

I am also a co owner of Grainery Farms. We use the exchange to hedge over 7,000 acres of farmland in three different states. This represents over 2 million dollars in annual grain sales.

We all believe that the current pit based settlement is a key factor to our business and a change to electronic or hybrid settlement would have a detrimental effect on all of our business.

We believe the price discovery and transparency that is achieved from open outcry is superior to that achieved from electronic settlement procedures.

I feel my own volume combined with the entire customer and filling business I do represents a significant amount of volume. I am requesting that the CME revisit this decision and take these facts into consideration to keep the current pit settlement procedures in place.

Respectfully,

William Rinn III

To CME Group,                                    12-21-11

As an active customer of the CME Group, I am writing to voice my strong opposition to the proposed rule change regarding settlement procedures in a variety of CME and CBOT products. The current method of pit and open outcry settlement adequately meets my needs. Furthermore, I appreciate the liquidity and transparency currently offered with pit settlement.


Thank you for your consideration.

*[signature]*                                    LEE ISAAC

To CME Group,

As an active customer of the CME Group, I am writing to voice my strong opposition to the proposed rule change regarding settlement procedures in a variety of CME and CBOT products. The current method of pit and open outcry settlement adequately meets my needs. Furthermore, I appreciate the liquidity and transparency currently offered with pit settlement.

Thank you for your consideration.

Norman Timmerman

To: CME Group

The CME group has to look at the purpose of settlement. Any proposed change that could affect the health and integrity of the marketplace should be considered by all participants and not just a select few. I do not feel the CME group has a valid reason to change the price settlement policy, other than to accommodate a small group of people at the expense of thousands of others! The CME group needs to look at the good of the whole, not just what is good for them. It seems one or two customers feel the need to skew the market unfairly. Finally, this exchange was founded and built on fair and equitable markets by thousands of hardworking and conscientious people. We welcome an open discussion by a panel of participants: brokers, traders, end users, hedgers and producers, to find an equitable solution to this situation.

Sincerely,

*Glenn S. Bromagen.*
*C.M.E. Member*

December 21, 2011

I am a broker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

Thomas J Carhart (TJC)



G. Man

**Alan Young <alyajy1@gmail.com>**

# The Demise of the CME Group

1 message

**James Ferrill <zzz281996@yahoo.com>**                         **Wed, Dec 21, 2011 at 1:04 PM**
To: alyajy1@gmail.com

I am writing this letter in regards to the petition being circulated on the floor against eliminating settlement prices being derived via open outcry.

The open outcry system has been in place for as long as we have been alive. Alive is the correct term to use in this instance because it is exactly that which we are fighting for, our lives. Professionally and financially. We on the the floor have seen the devastation wrought by the elimination of open outcry settlements. It has eliminated countless positions at the CME Group. Using an algorithm to settle futures markets while eliminating the input of the open outcry (pit) community is ridiculous. Who made this exchange what it is today? It certainly wasn't a computer. They have had an impact, this much is clear. Good or bad is in the eye of the beholder. When the flash crash happened in the S&P futures, all the bids and offers dried up faster than you could say, "We're closed". The market spread was dollars wide. Who filled the gap in liquidity? The locals in the pit, that's who. Just like they have for decades.

We all know what will happen to the futures products once they go fully electronic. The customer will suffer as well as the exchange. Some think the exchange will benefit. They may, in the short term. In the long term however I feel the exchange will lose.

The worst of times call for the best of people. In wild and extraordinary times the locals have stepped up to make markets at the risk of losing their entire net worth. Where were the bids and offers when we needed them in the flash crash? The computers sat that one out. Why should you deem them worthy of settlements when they don't or won't maintain a liquid and orderly market when we need them the most?

Does no one listen to the people who are the captains of this industry anymore? I think they should give a good listen to the membership and not implement this hybrid settlement system.

Jim Ratcliff
broker
775 Ridgelake Blvd.
Memphis, tn. 38120

1/17/12

Dear CME GROUP,

As an active broker, I am writing to voice my strong opposition to the proposed change in
the rule regarding settlement procedures in the CME and CBOT agricultural contracts.
When electronic trading was introduced, I was excited about the new platform to enhance
agricultural markets. The marketplace was led to believe there would be 2 venues that
were transparent, equitable and liquid. What you have now is 2 diluted markets that are
not held to the same rules. Electronic markets are not on an even playing field and these
destructive practices have driven needed participants to use other methods of trading and
hedging. The poor decisions being made will affect the marketplace and ultimately the
jobs that support the industry.
I appreciate the liquidity and transparency currently used with pit settlements; and feel
the use of electronic trade is easily manipulated. By passing this rule, you will give more
power to the electronic trade that manipulated and compromised the integrity of the grain
and livestock contracts.

Sincerely,

Attention CME Group,

     The recent decision to change the settlement process is one made without consideration to all parties directly affected by this change. This exchange was founded with the principle of "Free Markets for Free Men" a principle which has fallen by the wayside in lieu of the benefit of a select few. At any given time trading floor operations employ a minimum of 4,000 hardworking individuals, people like you and me, who will be forced to watch as this biased decision destroys their very livelihoods. For the past 92 years, this exchange has relied upon the hard work and dedication of traders, brokers, end users, clerks, producers and hedgers. To implement a change in the price settlement policy without the input of the aforementioned parties is a decision made without regard to the Fair Dealing section of the CME Board Code of Ethics. I ask on behalf of all parties involved that you take the necessary steps to arrange a meeting in which both sides of this issue are given an opportunity to discuss and make a reasonable solution.

Sincerely,

Ken Zekich

Any business thrives when it is responsive to its customers, when their interests are considered and protected.

As a shareholder of the CME Group as well as a floor trader, I and a sizable group of my peers have felt that our view points have not been honestly and legitimately considered.

A major settlement decision is about to be enacted without customer input or impact studies.

As a customer that would directly be affected, I ask that instead of a rush to decision, a panel of floor users and customers be given a chance to voice their positions.

As electronic trading makes it easy to trade at any change, this exchange should evaluate how important the floor population is to overall volume and realize that we too have choices of where to trade.

*Janet Distilloy*



Alan Young <ajyajy1@gmail.com>

# Settlement Changes

1 message

**Jimmy Boyle <jpboyle2@gmail.com>**
To: ajyajy1@gmail.com

**Wed, Dec 28, 2011 at 10:53 AM**

To whom it may concern,

I am a full CME member and do 90 - 95% of my trading over the Globex platform. I love Globex and I think it is the greatest thing since sliced bread, however I do not want to wait around an extra three hours everyday for settlement prices to be calculated. There are really only two possible solutions for settlement prices, either they are established via the pit close or exclusively on globex, not a mix between the two. I see no reason for the settlement procedure to change from its current state. It is effective, honest and efficient. There are no icebergs, phantoms, or other order entry nonsense being played. An honest and fair price is what the floor settlement price brings and there is absolutely no reason to change it.

Sincerely,

James P Boyle II

NAME: RONALD ZAIS
STREET: 2143 WEST WARNER
TOWN: CHICAGO
STATE: ILLINOIS

To CME Group Board of Directors and Management Staff,

I am writing to oppose the plan to have settlements include electronic trading platform rather than purely by open outcry.

The price of my crop is directly based on settlements. I believe the new process will severely and negatively impact the integrity of the agricultural futures markets. I am deeply concerned about the degradation of the hedging mechanism due to the electronic market. The potential for price manipulation occurs when an electronic trader places a massive unregulated order and slams the electronic market in the last mille-seconds of the trading day. This allows HFT (high frequency traders) and algorithmic traders to manipulate prices to benefit their books.

I don't believe that the CFTC and CME Group have addressed the interests of the farmer in mandating this change.

**I do not want any electronic market influence on the settlement procedure.**

Sincerely,

Please type your name to sign:

RONALD ZAIS



William Conover
INTL / FC Stone
230 South LaSalle,
Suite 10-500
Chicago, IL 60604
Phone: 312-780-6700

January 24, 2012

Dear CME GROUP,

The market works best when side by side, not one or the other. The floor is a necessity to keep the markets in line!

Sincerely,

William Conover

wlconover@hotmail.com

The market works best when side by side, not one or the other. The floor...



Rob Heineman

FUTURES INTERNATIONAL

190 S. LaSalle St.

Suite # 1720

Chicago, Illinois 60603

Phone: 773-960-2696

March 7, 2012

Dear CME GROUP,

Employ humans! The floor has a history and a purpose. Don't sell us out for profits, and a false idea of market improvements!

Sincerely,

Rob Heineman

rheineman@futures-int.com

Rene Tricou
OMEGA FUTURES GROUP
463 Timbercreek Drive
Tennessee 37803

March 29, 2012

Dear CME GROUP,

If the pits close then the electronic DarthVadors will be better able to
manipulate prices and run stops. The floor keeps the electronic trading honest and
the electronic trading keeps the floor honest. I know it's all about the money AND
it should be, this is America.

Just increase the clearing for Agricultural products!

Sincerely,

Rene Tricou

tricou@usa.net

Ronald C. Zais
2143 west Warner
Chicago, IN 60618

773-682-0687

Subject: Blended Settlement prices

To whom it may concern

My name is Ronald C. Zais and I have been a member of the Chicago Board of Trade since 1975

Previously I worked for a large commercial firm in many different capacities from runner, back office, phone clerk, outtrade checker, house broker, to floor manager for a total of 26 years.

For the last 15 years I have been a broker/trader in the soybean meal pit.

I was on the Arbitration committee for several years and am now co-vice chairman of the soybean meal pit committee.

As you can see I have done and seen most of what has happened and have an idea of what will happen
with the new proposal.

Your idea of a blended close between the computer and the floor trade to establish a settlement price
is in my opinion a poor decision for the following reasons.

Beans now close between 1:14-1:15 with the computer. Soybean oil closes on a call from top option to back options from 1:15 till approx 1:17. Meal from back months to top option in roughly same time frame.
This system allows several groups of local crushers to see approx where beans will settle go to the oil pit and keep the crushes somewhat in line (oil not to high or to low from where the beans closed) and then run to meal and keep that from closing to high or to low depending on where beans were.

The Mid gives them an opportunity to get close to even by the end of the day.

If I understand it correctly most auto spreaders and crush programs shut off at 1:14 taking any spreading
opportunities between markets completely away allowing Oil and Meal to close with no relationship to soybeans on the computer. This is terribly unfair to all concerned, from oil/meal spreaders to oil/bean spreaders to meal/bean spreaders and especially crushers both local and Commercial. It is physically immpossible for local crushers to get to all three pits in 1 minute and do what they do with remarkable efficiency to keep the computers in line with regards to the spd markets between the three pits.

Harley Sietsema

SIETSEMA FARMS

11304 Edgewater Dr. Suite A

Allendale, Mi. 49401

Phone: 616-895-7493

April 12, 2012

Dear CME GROUP,

I agree with this petition. The market is being run by those who have very little, if anything to do with the actual trading of the commodities involved.

Let's get this system back to what it was originally intended for!

Sincerely,

Harley Sietsema

hsietsema@sietsemafarms.com

Date 04/11/2012

Dear CME GROUP,

As an active customer and ███████ I am writing to voice my strong opposition to the proposed change in the rule regarding settlement procedures in the CME and CBOT agricultural contracts.

When electronic trading was introduced, I was excited about the new platform to access agricultural markets. The marketplace was led to believe there would be 2 venues that were transparent, equitable and liquid. What you have now is two-tiered markets that are not held to the same rules & ethics.

Electronic markets are not on an even playing field and these destructive practices have driven the needed participants to use other methods of trading and hedging risk. The poor decisions being made will affect the market volume and ultimately the jobs that support the industry.

I appreciate the liquidity and transparency currently used with pit settlements; and feel the use of electronic trade is easily manipulated and not transparent. By passing the settlement decision to an electronic close or volume base hybrid, you will give more power to the electronic trade. This has and will continue to manipulate the integrity of the grain and livestock contracts.

Sincerely,

Mary Richard

Savana Butler

March 7, 2012

Dear CME GROUP,

As an active customer and trader, farmer, rancher, producer, grain elevator, hedger, or end-user, I am writing to voice my strong opposition to the proposed change in the rule regarding settlement procedures in the CME and CBOT agricultural products.

When electronic trading was introduced I was excited about the new platform to enhance the agricultural markets. The market place was led to believe that there would be two venues that would be transparent, equitable and liquid. What you now have are two diluted, illiquid markets that are not held to the same rules and ethics. These destructive practices have driven the needed participants to use other methods of trading and hedging. The decision to switch to a blended-settlement or an electronic settlement will inevitably negatively affect the market volume and ultimately the jobs that support the industry.

I appreciate the liquidity and transparency currently employed in pit settlements. I feel the electronic market would be used to easily manipulate the settlement process thereby diminishing the integrity of the grain and livestock markets. I feel that pit settlement is a superior method of end of day pricing. The leverage the CME has given to computer algorithms has and will continue to erode the integrity of the grain and livestock contracts.

Sincerely,

Savana Butler

vanabanana93@yahoo.com

Tom Bagley

February 1, 2012

Dear CME GROUP,

    I grew up on a dairy farm. My family used the CME and CBOT products via open outcry for the past 40 years. They still use the method today.

    We appreciate the floor community and the knowledge they provide.

    Sincerely,

    Tom Bagley

tombagley@aol.com

schultz1@htc.net

Elmer and Carol Schultz
3234 N 800 W
Rensselaer, IN  47978-8630

We our a family of Farms in Rensselaer, IN.  I oppose the changing of the pricing
procedure.  (Strongly) Thanks for letting me no about it .

Elmer and Carol Schultz

Evelyn Felt
Al Felt

15815 Marion Center Rd

Decatur, IN 46733-9605

EvelynFelt@ideal-builders.com

We Oppose Change the Settlement method for our Corn Products at the CBOT.

Thank you,

Evelyn Felt



Brett Engelmann

ROSENTHAL COLLINS GROUP, LLC

141 W Jackson Blvd # 2210

Chicago, IL

Phone: 312-655-1724

January 23, 2012

Dear CME GROUP,

Although there are benefits to Globex, the negatives are slowly starting to become larger and harder to forget about. The lack of transparency and increase used by hedgefunds, that have no regard for using the market as it should be used. For over 150 years this place has set grain prices and allowed buyers and sellers to hedge. It is slowly becoming impossible as these high frequency traders make prices move to unrealistic prices.

Sincerely,

Brett Engelmann

bengelmann@rcgdirect.com

used by hedgefunds, that have no regard for using the market as it should be used

# Henning&Carey LLC

Brian Herald

HENNING & CAREY TRADING

141 W Jackson Boulevard

Chicago, IL 60604-2929

January 24, 2012

Dear CME GROUP,

I think the floor adds a valuable service to the market. If we eliminate it we might as well be called the New York Merchandise.

Sincerely,

Brian Herald

bherald76@hotmail.com

Brian Shaughnessy

April 30, 2012

Dear CME GROUP,

It's a shame people don't do the trading anymore. Computers make up most of the volume and make decisions without human intervention. Algos have deeper pockets, have faster computers, and have severs right next to exchange servers putting smaller traders at a disadvantage. What a pit trader would get massive fines for and even jailed for in the past is now done 10's of 1000's of times a day by algos. FRONTRUNNING!

Computer trading = front running, manipulation, and an uneven playing field.

Sincerely,

**Brian Shaughnessy** don't do the trading anymore. Computers make no ma...

selh78@yahoo.com

... .... FRONTRUNNING! .

Brian Shaughnessy

Bruce Williams

January 06, 2012

Dear CME GROUP,

I have been a market maker on the CBOT floor for 30 years. I left the pit 3 years ago to trade on the screen. I currently trade on the screen from the floor. You now have 2 markets that are split up and diluted instead of 1 great liquid one. You also have very little regulation to what high frequency traders are allowed to use in there programming.

Screen based trading is NOT a level playing field. So we are currently stuck in this poor excuse of a market!

Sincerely,

Bruce Williams

Bawsoya@aol.com

Kelly King

January, 05, 2012

Dear CME GROUP,

I believe well-regulated open-out cry is a highly efficient and superior market model for agricultural commodities. I believe that commodity index funds have no place in our markets. It is widely believed that they distort prices. I believe that automated trading systems that compete against each other and can manipulate a market faster than someone can think have no place in food markets.

These two factors combined are responsible for the record high prices we have witnessed in past years. And these high prices will be nothing if there is a real natural catastrophe, which we have not faced since going electronic in Aug. of 2006. There have been threats of drought and flooding and late planting, but nothing like we saw in 1988 or 1993. Our skilled brokers and locals created tight, liquid markets. In 1988 we lost 25% of the corn crop, it was the 3rd worst natural disaster in our country's history, and we didn't go above $4.00. If that happened now we could be trading $20 and the planet would starve. Food and Energy markets should be handled at the speed of human thought. I don't remember any of these problems happening 10 years ago.

There is always room for oversight, but these markets are not operating efficiently anymore... look at the failed Wheat market.

Sincerely,

Kelly King

kelly@sonictrax.com

Kerrick Wilson

KER-SON FARMS

14770 State Route 122

Somerville, OH 45064-9620

Phone: 937-409-5858

March, 27, 2012

Dear CME GROUP,

I think there is too much speculation going on in the markets. We are farmers that sell grain and buy grain for our animals. I don't care for high prices, but I can't believe that as high as the last years, crop got back in the summer and fall of 2011 because of the tight supply, weather issues, and supply

and demand, and this year crop is smaller than last years. China has been buying more corn than last year, drought in South America.

To me, those speculators are keeping the price low, for whatever reason. Just seems like Supply and Demand should take care of themselves, (We have low supply and we have demand) not speculators.

Thank you, a concerned investor.

Sincerely,

Kerrick Wilson

kersonfarms@aol.com

Jason Linn

THE LINN GROUP, INC.

Chicago Board of Trade

141 W. Jackson Blvd, 1220A

Chicago, IL 60604

Phone: 800-548-5580

March 23, 2012

Dear CME GROUP,

The Agricultural futures markets are more than an agricultural financial instrument for black-box's to churn out volume. They are here to protect producers and users first and foremost with the pits in Chicago needed for REAL Liquidity and Transparency by their market makers every day in every global situation.

If the floor goes away - only a matter of time before the HFT goes away as well - CME group should be smart enough to realize that without real customers and market makers they don't have a product and the stockholders will run. Sometimes the best business decisions are not the ones for a quick buck - but the ones that keep you in business for generations with a solid foundation.

There is a mix of screen and pit that works - but today the screen has been given all advantages and the pits have been placed behind the 8 ball.

CME group can turn this around - at least we hope they do – hopefully they have the foresight.

Sincerely,

Jason Linn

jrlcbot@linngroup.com

1

Kathleen Marshall

March, 7, 2012

Dear CME GROUP,

As an active customer and trader, farmer, rancher, producer, grain elevator, hedger, or end-user, I am writing to voice my strong opposition to the proposed change in the rule regarding settlement procedures in the CME and CBOT agricultural products.

When electronic trading was introduced I was excited about the new platform to enhance the agricultural markets. The marketplace was led to believe that there would be two venues that would be transparent, equitable and liquid. What you now have are two diluted, illiquid markets that are not held to the same rules and ethics. These destructive practices have driven the needed participants to use other methods of trading and hedging. The decision to switch to a blended-settlement or an electronic settlement will inevitably negatively affect the market volume and ultimately the jobs that support the industry.

I appreciate the liquidity and transparency currently employed in pit settlements. I feel the electronic market would be used to easily manipulate the settlement process thereby diminishing the integrity of the grain and livestock markets. I feel that pit settlement is a superior method of end of day pricing. The leverage the CME has given to computer algorithms has and will continue to erode the integrity of the grain and livestock contracts.

Sincerely,

Kathleen Marshall

wheezy369@hotmail.com

We want NO electronic influence on agricultural livestock and grain trading prices.

Ken Christenson
Judy Christenson

KJF FARMS



**Cattlco, LLC**
775 Ridge Lake Blvd., Suite 450, Memphis, TN 38120-9473
Telephone: 901.766.4466    Facsimile: 901.766.8157

January 17, 2012

Mr. Tom Clark
Manager and Associate Director
CME Group
20 South Wacker Drive
Chicago, Illinois 60606

Via FEDEX
Via email: thclark@cme.com

Dear Tom:

About two weeks ago, I received a call from a gentleman in your office asking my opinion on settlement procedures of cattle. I stipulated that I had not seen any real data, but was open to whatever method gave the truest price discovery. Since that time, I have had time to reflect on the methods and discuss with my long-standing floor broker of 25 years.

My opinion today is that even though the volume has tripled from the days where open outcry was only game and we held 10-15% of open interest in our active personal hedge accounts and sometimes 10-20% of the total daily volume primarily in the spread trade, the ability to easily move large trades have become more cumbersome. Simply said, the cattle pit traders provide a convenience to get large trades done or offered that meet our daily goals, especially in the delivery period. I would love to look closer at your data for making such a change and see how the human element of the closing period works when the algorithmic traders are in full control and the few seconds of a human mind with its delay are matched to take advantage of a disparity in the final seconds.

We depend on a fair closing statement to settle our daily equity requirements with our banks. Can you guarantee me that this method will actually reduce volatility in that time period? We understand that costs are high and that running floor operations are expensive, but that human element does bring about a reasonable test when issues get "out of line". Outside of your shareholders or the non-industry traders, who has complained of the costs to run these floor operations? Are we not really talking about keeping the floor open?

As a cattle feeding operation with capacity of 110,000 head and yearly sales of $280 million in all of our operations and very low single margin profits, we fully depend on the ability to hedge and will not be in business without this mechanism. We are not fully vertically structured and do not directly have the consumer or final user to offset our risk. Our only option to survive is with your ability to bring us fair and true price discovery, especially as it relates to the delivery period. Without it, our only option is to become a custom feeder for the large packers or most likely cease operations.

*FEEDLOTS:* Cattlco-Fort Morgan  13946 County Road 21, Fort Morgan, CO 80701   Tel: 970.867.4977   Fax: 970.867.4904
Cattlco-Liberal  14826 Road 4, Liberal, KS 67901   Tel: 620.624.1893   Fax: 620.624.9722
Cattlco-Middleton  940 Lenoir Road, Middleton, TN 38052   Tel: 731.376.8981   Fax: 731.376.8981



## g

2 messages

Wed, Jan 18, 2012 at 9:55 AM

Clay Mosley
Owner: Clay Mosley Cattle Co./Partner: Dixie Cattle Co.
1777 Dymoke Dr
Collierville, TN 38017
>

Dear CME Group—As an active customer and cattle feeder, I am writing to voice my strong opposition to the proposed change in the rule regarding settlement procedures in the CME and CBOT agricultural contracts. As electronic trading came to be, I was excited about the new platform and the opportunities they would provide. I was equally calmed by knowing we would have 2 venues that were transparent, equitable and liquid. Regrettably what we now have is 2 markets diluted compared to one great liquid trade. Electronic markets have forced participants to use other methods of trading and hedging, taking away jobs from the CME. I appreciate the liquidity and transparency currently used with pit settlements and feel any other means of settlement could be subject to manipulation.
Sincerely,
Clay W Mosley

Wed, Jan 18, 2012 at 9:57 AM

[Quoted text hidden]

Mike Smith
Smith Cattle Co
3310 I-40 West
Amarilo, TX  79102


1-18-2012

Dear CME GROUP,

As a cattle feeder and hedger I am opposed to any procedural change in the settlement of
livestock. I fully depend on the ability to hedge and would not be in business without this
mechanism. I feed well over 100,000 head of cattle annually.

I believe any rule change, such as the CME proposes, would hurt the liquidity and transparency
currently used with pit settlement. The cattle pit traders provide a convenience to get large
trades done and meet our daily goals, especially during the delivery period.
And, I feel the use of electronic settlement is easily manipulated and will compromise the
integrity of the contract.


Sincerely,

Mike Smith



Alan Young <ajyajy1@gmail.com>

## Protect the pit

1 message

**Anthony Dina <tuna800@comcast.net>**
To: "ajyajy1@gmail.com" <ajyajy1@gmail.com>

**Tue, Dec 27, 2011 at 8:56 AM**

CME Group,
   As an A & B shareholder an a active customer of the CME Group, I am writing to voice my strong opposition to the proposed rule change regarding settlement procedures in a variety of CME and CBOT products. The current method of pit and open outcry settlement adequately meets my needs. Furthermore, I appreciate the liquidity and transparency currently offered with pit settlement.

Thank you for your consideration.
Anthony J. Dina Jr. (TUNA)

Sent from my iPhone

December 29, 2011

Terrence Duffy
Executive Chairman
CME Group
30 South Wacker Drive
Executive Suite
Chicago Il, 60606


Dear Terrence Duffy:

My name is Matthew Todd (MTR), a current trader/customer at the CME Group. In 1993 I moved from

Ohio to Chicago after graduating college in hopes of becoming a Commodities Trader, in late 1993 I

was hired by the CME as a Pit Reporter, a year later I was hired by a T-bill Trader as a clerk and finally

after years of hard work and saving money, I went through membership and started trading in 2004 in

the Lean Hog pit.

I am writing you today to express my concern over your proposed change in settlement

procedures in a number of CME and CBOT products.

As an active member of the Lean Hog community I feel that the current pit/open outcry settlement

procedures provide a transparent forum for all participants to not only conduct business, but allows the

real market makers(not takers) to provide the necessary liquidity to a market that solely exists because

of this liquidity. We are market makers that hold positions and provide the basis for why a futures

market and this exchange has survived for the last hundred years.

In conclusion, I feel moving the settlements to a screen based solution will only provide more room for

settlement manipulation and expose customers to more risk, which will result in decreased volume and

put a wonderful investment/hedging tool at risk of being marginalized.


Thank you for your consideration.

Sincerely,

Matthew R. Todd

To: CME Group

The CME group has to look at the purpose of settlement. Any proposed change that could affect the health and integrity of the marketplace should be considered by all participants and not just a select few. I do not feel the CME group has a valid reason to change the price settlement policy, other than to accommodate a small group of people at the expense of thousands of others! The CME group needs to look at the good of the whole, not just what is good for them. It seems one or two customers feel the need to skew the market unfairly. Finally, this exchange was founded and built on fair and equitable markets by thousands of hardworking and conscientious people. We welcome an open discussion by a panel of participants: brokers, traders, end users, hedgers and producers, to find an equitable solution to this situation.

Sincerely,

William C Sauman                    WCB - Live Cattle

                                    12 - 27 - 11

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

(DZN)

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

Tko

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

(LZ)

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

ROB

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

Charlie Bros III

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

Fred Batchel (FMB)

Thank you for your consideration in this matter.

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

BRG

Stephen T. Berg

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

Steven Loulousis
SVL

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

Rory O'Donnell

RPO

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

December 21, 2011

I am a Market Maker and a Floor Broker on the CBOT floor. I and my customers want the current settlement process to remain. We do not want a full screen settlement.

FAS

Joseph Fasano

December 21, 2011

I am a Market Maker and a Floor Broker on the CBOT floor. I and my customers want the current settlement process to remain. We do not want a full screen settlement.

TMO

Thomas O'Brien

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

David J. Fisher

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

THANK YOU
michael R Cameron

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

Andrew W. Bizub    AwB

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

Thomas G. Conroy (TRC)

Thomas G. Conroy

7

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

MGL -FULL MEMBER

_Marc S M°Hue_

12-29-11

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

MMS

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

Alan Palmer

January 06, 2012

Dear CME GROUP,

Keep listening to Goldman Sachs and CME will be out of business.

Sincerely,

Alan Palmer

palmeralan1@comcast.net

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

*[signature]* (LIB)

... ....... .. the grain floor of the Chicago Board of Trade. I support the current settleme...

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

...ker on the grain floor of the Chicago Board of Trade. I support the current settle...

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

(JHT)

John H Tocks

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

James Gorman — JGG - 213

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

*Guy Scardina*

SCR

December 21, 2011

I am a market maker on the grain floor of the Chicago Board of Trade. I support the current settlement method and do not want it to be altered. I want settlement prices to be determined by open-outcry trading in the pit on the close.

Thank you for your consideration in this matter.

(BLC)